1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

VHT, INC.,

Plaintiff,

v.

ZILLOW GROUP, INC., et al.,

Defendants.

CASE NO. C15-1096JLR

ORDER

**(PRELIMINARILY FILED
UNDER SEAL)**

15

## I.   INTRODUCTION

16     Before the court are multiple motions by Plaintiff VHT, Inc. ("VHT"), and

17  Defendants Zillow Group, Inc., and Zillow, Inc. (collectively, "Zillow").  Zillow moves

18  for judgment on the pleadings based on VHT's purported failure to join indispensable

19  parties.  (MJOP (Dkt. ## 98, 99); *see also* MJOP Resp. (Dkt. # 116); MJOP Reply (Dkt.

20  # 118).)  Zillow also moves for summary judgment on all five of VHT's copyright

21  infringement claims.  (Zillow MPSJ (Dkt. # 129); *see also* VHT MPSJ Resp. (Dkt.

22  ## 171 (sealed), 173 (redacted)); Zillow MPSJ Reply (Dkt. # 181).)  VHT cross-moves

for summary judgment as to liability on its copyright infringement claims and seeks summary judgment on Zillow's four counterclaims. (VHT MPSJ (Dkt. ## 137 (redacted), 141 (sealed)); *see also* Zillow MPSJ Resp. (Dkt. # 168); VHT MPSJ Reply (Dkt. # 179).)

Zillow also seeks to exclude the expert testimony of Robert Henson, VHT's expert on fair market value. (Zillow Expert Mot. (Dkt. # 125); *see also* VHT Expert Resp. (Dkt. # 157); Zillow Expert Reply (Dkt. # 167).) VHT seeks to exclude all three of Zillow's expert witnesses: Patrick Gannon, Jeffrey Sedlik, and Jon Vogel. (VHT Expert Mot. (Dkt. # 131); *see also* Zillow Expert Resp. (Dkt. # 159); VHT Expert Reply (Dkt. # 166).) In addition, the parties have filed a multitude of motions to seal various documents. (Mots. to Seal (Dkt. ## 127, 134, 136, 162, 170, 197, 204).)

The court has considered the parties' motions and briefing, the relevant portions of the record, and the applicable law. In addition, the court held oral argument on December 21, 2016. Considering itself fully advised, the court GRANTS in part, DENIES in part, and DEFERS in part the various motions as detailed herein.

//

//

//

//

//

//

//

## II.    BACKGROUND[1]

This is a copyright case between VHT, a real estate photography company, and Zillow, which owns and hosts a website and computer application ("app") geared toward realtors and homebuyers.  (*See generally* 3d Am. Compl. (Dkt. # 123).)  VHT commissions photographs and then copyrights them and licenses them to real estate professionals.  (*See id.* ¶¶ 16-38.)  Zillow features photographs on two platforms that are relevant to this lawsuit:  (1) its listing website, which consists primarily of "Home Details Pages" or "HDPs," and (2) "Digs," a website and app geared toward home improvement.  (*See id.* ¶¶ 2-5; 10/25/16 Kutner Decl. (Dkt. # 130) ¶¶ 3-4.)

### A.    VHT's Business

VHT is a real estate photography company that commissions photographs from professional photographers.  (10/25/16 Hensley Decl. (Dkt. # 140) ¶ 2, Ex. A ("Balduf Dep.") at 20:13-15; *id.* ¶ 3, Ex. B ("Bosch Dep.") at 39:6-9, 51:9-52:8; *id.* ¶ 15, Ex. N ("VHT Contractor Agmt.") at VHT005555-58.)[2]  VHT's clients, which include real estate

---

[1] Where the parties have filed a sealed version and a redacted version of the same document, the court's citations herein are to the sealed version.  In consideration of the potential that this order references confidential information, the court preliminarily files this order under seal and directs the parties to indicate what information, if any, needs to be redacted in the unsealed version of this order.  *See infra* § III.D.

Whenever possible, the court's citations to an exhibit in the record use the document's Bates number.  When an exhibit lacks Bates numbering, the court uses the pagination internal to the exhibit.

[2] The parties have placed excerpts from several depositions in the record.  Some of these excerpts appear in part in multiple places in the record.  When first referencing the transcript of a particular deposition, the court references the declaration and paragraph affirming the authenticity and accuracy of the relevant deposition transcript.  However, in subsequent citations

brokerages and real estate agents, use VHT's photographs to market their properties and listings.  (Balduf Dep. at 20:18-21:2.)

Because VHT commissions a high volume of photographs, it group-registers its copyrights on those images with the United States Copyright Office.  (10/25/16 Berkovits Decl. (Dkt. # 139) ¶¶ 2-3.)  Since January 2014, VHT has filed 14 group applications with the Copyright Office.  (*Id.* ¶ 2, 8.)  As of October 25, 2016, the Copyright Office had approved 11 of those 14 applications.  (*Id.* ¶ 4, Ex. 1 ("Copyright Regs.").)  Those 11 registrations cover 75,823 of the images at issue in this lawsuit.  (10/25/16 Berkovits Decl. ¶ 4; 10/25/16 Baker Decl. (Dkt. # 138) ¶ 17.)  As to the remaining 8,577 images (10/25/16 Baker Decl. ¶ 17), the Copyright Office was on notice more than 60 days ago of the pendency of this action and has not appeared (10/25/16 Berkovits Decl. ¶ 8, Ex. 7).  Accordingly, in its motion for partial summary judgment, VHT asks the court to "determine that those [8,577 unregistered] photos are the subject of valid copyrights [and] properly included in this action."  (VHT MPSJ at 6 (citing 17 U.S.C. § 411).)

Two different types of licensing agreement between VHT and its clients are relevant to this lawsuit:  a Service Level Agreement and Photography Rider ("SLA") (*see, e.g.*, 10/25/16 Hensley Decl. ¶ 16, Ex. O ("Early SLA") at VHT004067-77) and VHT's Terms of Use ("TOU"), which are posted on VHT's website (*see* 10/25/16 Hensley Decl. ¶ 22, Ex. U ("TOU")).  VHT has identified more than 80,000 images on Zillow's website that VHT asserts violate its copyrights; of those images, 76,992 were

_____

to that deposition transcript, the court does not indicate which of the multiple locations on the docket contains that particular segment.

licensed under an SLA and 6,931 were licensed under a TOU.  (10/25/16 Baker Decl. ¶ 11 (citing *id.* ¶ 2, Ex. A ("Images Spreadsheet")).)

VHT has used different versions of its SLA, but VHT asserts that variations between the versions are "minor and immaterial."  (VHT MPSJ at 3 n.1.)  Of the 76,992 images that were licensed under an SLA, VHT licensed 56,235 under the "Early SLA," which VHT used until 2014.  (10/25/16 Baker Decl. ¶ 14; Early SLA at VHT004067-77.) The Early SLA provides, in pertinent part:

> License.  VHT owns and retains all copyrights for works created/produced by VHT, its affiliates, employees, contractors and subsidiaries.  Unless otherwise specifically agreed to in writing by the parties, VHT hereby grants Client a license to use the Visual Content produced by VHT in the sales or marketing of the subject property or the company/agent representing the property.  No other rights or uses are permitted without the prior written consent of VHT.  Client is under no circumstance permitted to sell or collect payment of any kind for the use or display of Visual Content produced by VHT.  Client is not permitted to assign the rights granted to Client by VHT to any third parties without express written consent from VHT.

(Early SLA at VHT004071.)  The record contains several different versions[3] of the SLA, and it is not clear from the record which SLA applies to what quantity of the remaining

---

[3] By way of example, the language below appears to be from a template version of the SLA that VHT provided to Zillow in discovery.  To compare the language from the template version to the Early SLA, the quote below shows portions that were deleted from the Early SLA by using strikethrough text and shows additions to the Early SLA in bold:

> License.  VHT owns and retains all copyrights for works created/ **or** produced by VHT, its affiliates, employees, contractors and subsidiaries.  Unless otherwise specifically agreed to in writing by the parties, VHT hereby grants ~~Client~~ a **worldwide, perpetual, irrevocable, non-exclusive, fully-paid and non-assessable** license to ~~use~~ **reproduce, distribute, copy, display, perform, modify and create derivative works of** the ~~V~~**v**isual ~~C~~**c**ontent produced by VHT **in hard copy or electronic form, in any medium now existing or hereafter created, for**

20,757 SLA-licensed photos.  (*See* 10/25/16 Hensley Decl. ¶ 17, Ex. P ("Baird & Warner SLA"); *id.* ¶ 18, Ex. Q ("Corcoran SLA"); *id.* ¶ 19 Ex. R ("Citi Habitats SLA"); *id.* ¶ 20, Ex. S ("Houlihan Lawrence SLA").)

At oral argument, the parties clarified that their dispute centers around two relevant linguistic alterations to the Early SLA.  First, some later versions of the SLA refer to "the client or the agent representing the property" rather than the "company/agent representing the property."  (*See, e.g.*, Template SLA at VHT038651.)  Second, some later versions of the SLA make reference to "perpetuity."  (*See, e.g.*, Houlihan Lawrence SLA at VHT005004 (licensing the visual content produced by VHT "in the sales or marketing of the subject property or the company/agent representing the property in perpetuity").)

VHT also sends a cover email to some prospective clients that introduces and attaches the SLA.  (11/14/16 Crosby Decl. (Dkt. # 169) ¶ 11, Ex. 10 ("Cover Email") at VHT013819.)  That email characterizes the license that the SLA grants to the prospective client:

> [The SLA] . . . addresses the full licensing rights we provide your brokerage.  We provide you a license to use the photographs wherever you

---

> **use** in the sales or marketing of the subject property**, the client** or the ~~company/~~agent representing the property.  No other rights or uses are permitted without the prior written consent of VHT.  Client is under no circumstance permitted to sell or collect payment of any kind for the use or display of ~~V~~visual ~~C~~content produced by VHT.  Client is not permitted to assign the rights granted to Client by VHT to any third parties without express written consent from VHT.

(*Compare* Early SLA at VHT004071, *with* 8/18/16 Sargent Decl. ¶ 4, Ex. 2 ("Template SLA") at VHT038651.)

want, any way you want, and for as long as you want. This includes promotion of your brokerage, your agents, and your listings. You just can't sell them.

(*Id.*) VHT has made similar representations to its clients in response to specific questions. (*See, e.g.*, 11/14/16 Crosby Decl. ¶¶ 14-15, Exs. 13 at VHT011137 ("[O]ur existing agreement/contract does not include copyright ownership for reselling of images. However, it allows you to use the images forever where ever [sic] and however you want to market you, agents, your brokerage,communities [sic] and properties."), 14 at VHT101961 ("Regarding display of the property by JL Scott after the sale of the property, our language allows for this as long as some form of attribution to JL Scott as the brokerage who sold the property is visible.").)

Individual agents who purchase photography services through VHT's website do not sign an SLA. (Balduf Dep. at 165:12-20.) Instead, VHT contends that web purchasers are subject to the TOU that is posted on VHT's website. (*Id.* at 165:21-166:3.) VHT's TOU states, in pertinent part:

> All images and media ("Content") created by VHT is the sole property of VHT. VHT retains ownership and licensing rights to all Content. Content is made available to clients for property specific marketing purposes only. Any publication of content for non specific [sic] property marketing purposes is strictly prohibited by law without the express written consent of VHT. All images and media ("Content") created by VHT is registered with the US Copyright Office.

(TOU at VHT093011.)

**B.   Zillow's Business**

Zillow operates Zillow.com, a large real estate website. (10/25/16 Kutner Decl. ¶ 2.) Two Zillow platforms—HDPs and Digs—are of primary relevance to this lawsuit.

(*See generally* 3d Am. Compl.)  HDPs present "a variety of data," including "address, size, sales history, . . . sale status, . . . [and] exterior and interior images," about "nearly every home in America."  (10/25/16 Kutner Decl. ¶ 3.)  Digs "includes a searchable set of images of home interiors classified by room type and tagged with information about the room contents, as well as 'boards' where users can save and share images they are interested in."  (*Id.* ¶ 4.)

Zillow obtains the photographs that it uses on HDPs and Digs from two main sources:  public records and real estate listings received from agents, brokers, and Multiple Listing Services ("MLSs").[4]  (*Id.* ¶ 5.)  Zillow contracts with each agent, broker, and MLS to clarify the terms under which Zillow may use the contents of each listing.  (*Id.*)  Some of those contracts restrict the manner in which Zillow may use photos after a property is sold; Zillow calls these contracts "deciduous."  (*Id.* ¶ 6.)  However, the majority of the contracts are "evergreen," meaning they do not restrict Zillow's ability to use data or images after a property sells.  (*Id.*)

Zillow receives its listings and photographs via "feeds," which periodically upload to Zillow's computers the listing information and photographs that Zillow's clients have provided.  (*Id.* ¶ 7.)  Because Zillow receives as many as five million new listing images per day, Zillow designed a mostly automated system to categorize photographs and determine whether or not they must be removed after a property sells.  (*Id.* ¶ 8.)  Based

---

[4] "MLS[]s are database services that aggregate property listings for the convenience of real estate industry professionals.  Generally speaking, listing agents and brokers pay membership dues to join an MLS, which allows them to upload all of their new listings to the MLS's database."  (3d Am. Compl. ¶ 36.)

on the type of agreement that Zillow has with the client that uploads a listing, Zillow's database tracks whether a given listing—and the photographs associated therewith—is evergreen or deciduous. (*Id.* ¶ 7.) When a client informs Zillow that a property has sold, Zillow's "automated teardown algorithms" determine whether or not the information on the HDP page, including photographs, can continue to be displayed. (*Id.* ¶ 8.) If Zillow has received a photo from any evergreen source, Zillow continues to display the photo after the property sells. (*Id.*; *see also* 11/18/16 Kutner Decl. (Dkt. # 182) ¶ 3 (indicating that as of November 15, 2016, Zillow had over 429 million evergreen images in its database).) In other words, even if a dozen sources, including the listing agent, have conferred only deciduous rights to Zillow, so long as one source confers evergreen rights to the photograph, Zillow classifies its rights as evergreen and its algorithm leaves the photograph up after the property sells. (*See* 10/25/16 Hensley Decl. ¶¶ 8, 42, Exs. G ("Bonert Dep.") at 63:22-67:22 (explaining how the automated teardown algorithms decide which source to credit), OO (same).) Zillow classifies its rights as deciduous only if Zillow possesses exclusively deciduous rights to the photograph. (*Id.*)

Zillow also programmed "trumping rules" in order to prioritize certain sources of photos over others. (Bonert Dep. at 26:10-18.) The "top trumping level" is an agent, followed by brokers, MLSs, and "web vendors or aggregators." (*Id.* at 31:3-15.) Each of these four levels has three sublevels to prioritize, for instance, local sources over international sources. (*Id.* at 31:16-25.) In total, then, there are 12 main trumping sublevels. (*Id.* at 32:8-10.) Upon receiving a new feed of photographs, Zillow assigns

//

the feed a trumping sublevel based on "the type of entity" that provides the feed. (*Id.* at 33:5-9.)

Zillow launched Digs in February 2013. (10/25/16 Kutner Decl. ¶ 4.) To do so, Zillow chose "an initial set of approximately 20,000 images" and moved them onto the Digs platform. (11/14/16 Hensley Decl. (Dkt. # 174) ¶ 3, Ex. 2 ("Gurney Dep.") at 157:25-158:16.) After Digs launched, users continued to populate Digs by saving images to their Digs boards from HDPs. (10/25/16 Kutner Decl. ¶ 12.) Zillow also moves some photographs to Digs when users select them but fail to complete the digging process themselves. (Gurney Dep. at 38:25-39:13.) During some but not all of the timeframe relevant to this lawsuit, posting an image to Digs also caused Zillow's servers to automatically render scaled versions of the photographs, which Zillow stored. (10/25/16 Kutner Decl. ¶ 13.)

Digs makes deciduous images that are part of an inactive HDP listing available only to the user who posted the image. (*Id.* ¶ 12.) However, when a Digs user posts an image that is either part of an active HDP or classified as evergreen, the photo enters a moderation cue. (*Id.*) Zillow moderators review each evergreen image posted to Digs to confirm that "it contain[s] no watermarks or other artifacts." (*Id.* ¶ 14.) Zillow moderators also confirm that the room is accurately classified and assess the photo's quality. (*Id.* ¶ 14-15.) If the photo passes moderation, it becomes visible to other users who visit the posting user's Digs board. (*Id.*) If the photograph is of particularly high quality, the moderators tag certain elements of the image, which makes those products easily searchable and purchasable. (*Id.* ¶ 15.)

## C.    Claims and Counterclaims

VHT alleges that HDPs and Digs—and the processes that Zillow implements to support those platforms—have copied tens of thousands of VHT-owned photographs and that Zillow has therefore directly infringed on VHT's copyrights.  (3d Am. Compl. ¶¶ 8, 109-31.)  Furthermore, VHT claims that Zillow indirectly infringes on VHT's copyrights because Zillow has materially contributed to, has induced, or is vicariously liable for direct infringement by its Digs users.  (*Id.* ¶¶ 132-59.)

Zillow denies VHT's allegations of direct and indirect infringement.  (*See generally* Zillow Answer (Dkt. # 156 at 1-26).)  In addition, Zillow alleges that VHT knowingly misled Zillow's users regarding the scope of their licenses with VHT and thereby induced Zillow's users to place on Zillow's website the pictures that led to this litigation.  (*See* Counter-Compl. (Dkt. # 156 at 26-35) ¶¶ 20-22.)  On that basis, Zillow asserts counterclaims against VHT for breach of the Washington Consumer Protection Act ("CPA"), RCW 19.86.010 *et seq.*; breach of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; trespass to chattels; and tortious interference with contract. (*Id.* ¶¶ 24-41.)  VHT denies all of Zillow's counterclaims.  (*See generally* VHT Answer (Dkt. # 175).)

### III.    ANALYSIS

## A.    Motion for Judgment on the Pleadings

### 1.  <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed "but early enough not to delay trial."  *See*

Fed. R. Civ. P. 12(c). Typically, a court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citation omitted); *see also Yakima Valley Mem'l Hosp. v. Wash. State Dept. of Health*, 654 F.3d 919, 925 (9th Cir. 2011) (court "assume[s] the facts alleged in the complaint are true"). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming*, 581 F.3d at 925; *see also Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011).

Failure to join a person required by Rule 19(b) may be raised in a motion for judgment on the pleadings. Fed. R. Civ. P. 12(b)(2)(B). Unlike when considering a typical Rule 12(c) motion, "[t]o determine whether Rule 19 requires the joinder of additional parties, the court may consider evidence outside the pleadings."[5] *Brimberry v.*

---

[5] Some courts in this circuit disagree with this statement of the law. *See, e.g.*, *Hi-Tech Gaming.com Ltd. v. IGT*, No. 2:08-CV-00244-PMP-GWF, 2008 WL 4952208, at *3 (D. Nev. Nov. 18, 2008) (considering outside materials that plaintiffs incorporated into the complaint and that were matters of public record, but declining to consider other outside evidence presented with a Rule 12(c) motion for judgment on the pleadings for failure to join an indispensable party). However, "[t]he charge that an indispensable party has not been joined may not be determined on a motion for summary judgment." *Dredge Corp. v. Penny*, 338 F.2d 456, 463 (9th Cir. 1964); *see also E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005) [hereinafter, "*Peabody I*"] ("Although the district court decided the [necessary party] issue on a motion for summary judgment, we construe the motion as one to dismiss for failure to join an indispensable party under Rule 12(b)(7)."). Thus, a motion under Rule 12(b)(7) or Rule 12(c) is the primary—and in many cases, the only available—procedural mechanism for presenting a Rule 19 dispute to the court. Precluding the court from considering outside evidence on such a motion would make it impossible to perform the "practical" and "fact specific" Rule 19 inquiry. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1359 (3d ed. 2004) ("[T]he burden is on the party moving under Rule 12(b)(7) to show the nature of the unprotected interests of the absent individuals or organizations and the possibility of injury to them or that the parties

*Nw. Mut. Life Ins. Co.*, No. CV 13-00127 RSWL (AJWx), 2014 WL 689911, at *2 (C.D.

Cal. Feb. 20, 2014) (citing *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960)); *see*

*also Behrens v. Donnelly*, 236 F.R.D. 509, 512 (D. Haw. 2006); 5C Charles Alan Wright

& Arthur R. Miller, *Federal Practice and Procedure* § 1359 (3d ed. 2004) ("The district

judge is not limited to the pleadings.").  The moving party bears the burden of persuasion.

*Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).

      2.  <u>Necessary Parties Under Rule 19</u>

      Federal Rule of Civil Procedure 19 "is designed to protect the interests of absent

parties, as well as those ordered before the court, from multiple litigation, inconsistent

judicial determinations or the impairment of interests or rights." *CP Nat. Corp. v.*

*Bonneville Power Admin.*, 928 F.2d 905, 911 (9th Cir. 1991).  Rule 19 imposes a

three-step inquiry:  (1) "[i]s the absent party necessary (i.e., required to be joined if

feasible) under Rule 19(a)?"; (2) "[i]f so, is it feasible to order that the absent party be

joined?"; and (3) "[i]f joinder is not feasible, can the case proceed without the absent

party, or is the absent party indispensable such that the action must be dismissed?" *Salt*

*River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012).

---

before the court will be disadvantaged by their absence.  To discharge this burden, it may be
necessary to present affidavits of persons having knowledge of these interests as well as other
relevant extra-pleading evidence."); *McShan*, 283 F.2d at 464 ("This court has a duty to protect
absent persons who will be affected by the lower court's decree, and our inquiry to determine of
[sic] such persons may exist should not be hampered by the evidentiary rules appellees would
impose.").

      Accordingly, the court concludes that it may consider the limited outside evidence that
Zillow has presented in support of its motion for judgment on the pleadings.  (*Cf.* MJOP Resp. at
14-15.)  The court notes, however, that even if it declined to consider that evidence, its
conclusion would remain unaltered.

Under step one, a party may be necessary in three ways:  if the court cannot accord relief among the existing parties without the nonparty, *see* Fed. R. Civ. P. 19(a)(1)(A); if the nonparty has an interest in the action and resolving the case without the nonparty will impair or impede the nonparty's ability to protect its interest, *see* Fed. R. Civ. P. 19(a)(1)(B)(i); and if the nonparty has an interest in the action and resolving the case without the nonparty may leave an existing party open to inconsistent obligations, *see* Fed. R. Civ. P. 19(a)(1)(B)(ii); *see also A.H.R. v. Wash. State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *7 (W.D. Wash. Jan. 7, 2016).  The inquiry into whether a party is necessary "is a practical one and fact specific, and is designed to avoid the harsh results of rigid application." *Makah Indian Tribe*, 910 F.2d at 558 (internal citations omitted).  To be necessary, a nonparty must have a legally protected interest, meaning more than a mere financial stake or speculation regarding a future event.[6] *See id.*

Zillow argues that VHT's licensees are necessary parties under Rule 19(a)(1)(A) and Rule 19(1)(1)(B)(i).  Zillow first contends that without joining VHT's licensees, the court "cannot grant VHT the complete injunctive relief it seeks."  (MJOP at 9 (citing Fed.

//

//

---

[6] If a nonparty is necessary, it must be joined if feasible.  *See* Fed. R. Civ. P. 19(a)(1).  If joinder is not feasible, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).  Because the court concludes that VHT's licensees are not necessary parties to this action, it need not determine whether joinder is feasible or whether equity and good conscience demand dismissal.  *See Salt River Project*, 672 F.3d at 1179.

R. Civ. P. 19(a)(1)(A)).)  VHT seeks

> a permanent injunction requiring that defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners and assigns, and all persons acting in concert or participation with each or any of them, cease directly or indirectly infringing, or causing, enabling, facilitating, encouraging, promoting, inducing or participating in the infringement of any of VHT's copyrights or exclusive rights protected by the Copyright Act, whether now in existence or hereafter created.

(3d Am. Compl. at 42 ¶ B.)  Zillow argues that any injunction issued here "would not bind VHT's licensees" and res judicata would not "prevent them from relitigating the scope of their licenses with VHT."  (MJOP at 9.)

VHT does not seek injunctive relief against its licensees[7] (3d Am. Compl. at 42 ¶ B; *see also* MJOP Resp. at 8-9), so the lack of a preclusive effect on those entities does not foreclose VHT from obtaining the injunctive relief it seeks in this lawsuit.  Moreover, VHT seeks monetary damages in addition to injunctive relief (3d Am. Compl. at 42 ¶¶ C-D), and VHT is not obligated to join all alleged infringers in order to obtain that relief, 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1614 (3d ed. 2004) ("A suit for infringement may be analogized to other tort actions; all infringers are jointly and severally liable.  Thus, plaintiff may choose whom to sue and is not required to join all infringers in a single action.").  The court therefore rejects Zillow's legal argument that the court cannot afford VHT the relief it seeks.

//

_____

[7] Zillow "presume[s]," without citation to support for its presumption, that the injunction that VHT seeks would include "VHT's licensees who provide photographs to Zillow."  (MJOP at 9.)  VHT clarifies that it does not seek to enjoin its licensees.  (MJOP Resp. at 8-9.)

Zillow also identifies several "practical problems" that Zillow contends would render any injunctive relief "illusory and therefore incomplete under Rule 19." (MJOP at 10.) Because its automated systems cannot distinguish VHT photographs from other photographs (*see* Bosch Dep. at 218:3-8, 219:5-19), Zillow argues that it could not remove VHT's images from its website or prohibit VHT's licensees from posting VHT photos directly to Digs (MJOP at 10-11). Shutting down Digs, instituting some form of manual review, or otherwise augmenting Zillow's automated systems may be practically difficult and negatively impact Zillow's bottom line, but those realities do not excuse Zillow's alleged noncompliance with federal copyright law. Moreover, VHT has provided a list of allegedly infringing photographs to which it purports to own the copyright. (10/25/16 Baker Decl. ¶ 2, Ex. A ("Images Spreadsheet").) Accordingly, the court rejects the argument that practical problems render VHT's licensees necessary parties on Rule 19(a)(1)(A) grounds.

In the alternative, Zillow argues that Rule 19(a)(1)(B)(i) renders VHT's licensees necessary parties "because proceeding without VHT's [licensees] risks impairing those [licensees]' ability to protect contractual interests that they bargained for." (MJOP at 11 (citing *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1076 (9th Cir. 2010) [hereinafter, "*Peabody II*"]).) As a substantive matter, Zillow contends that VHT's licenses authorize VHT's licensees to use VHT's photos in the manner that VHT alleges constitutes infringement. (*See, e.g.*, Zillow MPSJ Resp. at 1-9.)

"Under some circumstances, an absent party's contract rights may give it a legally protected interest in an action." *Ward v. Apple Inc.*, 791 F.3d 1041, 1053 (9th Cir. 2015).

For instance, an action implicates a nonparty's legally protected interest where a party seeks "equitable relief that would prevent a defendant from fulfilling 'substantial' contractual obligations to the absent party." *Id.* (quoting *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002); *Cachil Dehe Band of Wintun Indians v. California*, 547 F.3d 962, 970 (9th Cir. 2008)). Here, issuing the injunction that VHT seeks would prevent Zillow from fulfilling contractual obligations to VHT's licensees. (*See* 3d Am. Compl. at 42 ¶ B.) It is less clear whether those contractual obligations are substantial.

The court need not determine the substantiality question, however, because Zillow adequately represents the interests of VHT's licensees. A nonparty's interests are not "impaired or impeded," and the nonparty is therefore not necessary under Rule 19(a)(1)(B)(i), if a party "adequately represent[s]" the nonparty. *Salt River Project*, 672 F.3d at 1180 (citing *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992)). The court "consider[s] three factors in determining whether an existing party adequately represents the interests of an absent party: (1) 'whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments'; (2) 'whether the party is capable of and willing to make such arguments'; and (3) 'whether the absent party would offer any necessary element to the proceedings that the present parties would neglect.'" *Id.*

Consideration of these factors demonstrates that Zillow adequately represents VHT's licensees' interests. Zillow and VHT's licensees share a common interest in a verdict favoring Zillow. Such a verdict would allow VHT's licensees to continue

business as usual through Zillow.com and Digs.  Although one of Zillow's primary

arguments is that its "automated operations" did not constitute "'volitional acts' of direct

infringement" (Zillow MPSJ at 6-13), and that argument deflects blame onto VHT's

licensees, a conclusion in Zillow's favor has no preclusive effect on any of VHT's

licensees, *see Ward*, 791 F.3d at 1054.

Zillow replies that each of the more than one hundred VHT clients "has unique

evidence" and knowledge of future marketing plans, and those clients can therefore

"most effectively make this case through evidence and through advocacy."  (MJOP Reply

at 4-5.)  Much of the evidence Zillow references is of, at most, collateral importance to

this lawsuit.  Furthermore, Zillow and VHT are parties to this suit and possess copies of

the core agreements at issue.  As Zillow acknowledges, third-party discovery allows

Zillow to obtain other evidence to the extent it is relevant, proportional, and non-

privileged.  Zillow's vague, conclusory argument therefore fails to undermine the

conclusion that Zillow has the same incentive and ability to make the arguments that

VHT's licensees would make.  The court therefore concludes that VHT's licensees are

not necessary parties pursuant to Rule 19(a) and denies Zillow's motion for judgment on

the pleadings.

**B.  Motions for Summary Judgment**

Zillow moves for summary judgment on each of VHT's five claims.  (*See*

*generally* Zillow MPSJ.)  VHT opposes Zillow's motion (*see generally* VHT MPSJ

Resp.), argues that VHT is entitled to summary judgment as to liability on each of its five

//

claims (*see* VHT MPSJ at 6-25), and argues that VHT is also entitled to summary judgment on Zillow's counterclaims (*see id.* at 25-30).

1. <u>Legal Standard</u>

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" to withstand summary judgment. *Galen*, 477 F.3d at 658. The non-moving party may do this by use of affidavits (or declarations), including his or her own, depositions, answers to interrogatories or requests for admissions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court may only consider admissible evidence when ruling on a motion for summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002). "Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d

//

1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.").

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Only disputes over facts that might affect the outcome under the governing law are "material" and will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### 2. VHT's Unregistered Copyrights

As a threshold matter, VHT asks the court to determine the registrability of the copyrights on the 8,580 allegedly infringed images that the Copyright Office has not yet registered. (VHT MPSJ at 6.) "[W]here the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights." 17

U.S.C. § 411(a); *see also Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179, 1181 (9th Cir. 1983) (citing 17 U.S.C. § 411(a)) ("[A] party may now sue for infringement notwithstanding the refusal of the Register to register the claim to copyright.  The only precondition is that notice be served on the Register.  Once that has occurred, the district court can determine both the validity of the copyright, which in turn determines its registrability, as well as whether an infringement has occurred.).

The court declines to make that determination at this juncture.  Although VHT demonstrates that the Copyright Office has not registered the 8,580 images, it makes no showing that the Copyright Office's delay constitutes "refusal" by the Copyright Office. *Nova Stylings*, 695 F.2d at 1181.  In addition, the record does not show that the Register of Copyrights has been served with a copy of the complaint.[8] *See id.*  Because VHT's briefing does not establish the legal and factual prerequisites, the court cannot make this determination at this time.

However, the court's denial is without prejudice.  The court grants VHT leave to file a renewed motion on this limited issue.  The motion may not exceed five pages and must be filed no later than January 3, 2017.  Zillow's response, if any, must not exceed five pages and must be filed by 5:00 p.m. on January 6, 2017.  VHT may not file a reply.

//

--------------------------------------------------

[8] At oral argument, in response to a question regarding where in the record the court could find this evidence, VHT indicated that it is in Exhibit 7 to the October 25, 2016, Declaration of Yonatan Berkovits (Dkt. # 139-7 at VHT127000-08).  That exhibit contains an email thread between counsel for VHT and the Copyright Office, but it does not show that the Copyright Office received a copy of the complaint, as required under Section 411.

### 3. The Scope and Applicability of VHT's Licenses

VHT bases its motion for summary judgment as to its infringement claims on the argument that its SLAs and its TOU unambiguously limit the scope of the licenses that VHT grants its licensees. VHT and Zillow agree that pursuant to contractual choice of law provisions in the SLAs and the TOU, Illinois law governs the interpretation of the disputed language. (*See* VHT MPSJ at 9 & n.5; Zillow MPSJ Resp. at 3-4; *see also, e.g.*, Houlihan Lawrence SLA at VHT005003); *but see infra* n.9. Illinois employs the four corners approach to contract interpretation. *See Air Safety, Inc. v. Teachers Realty, Inc.*, 706 N.E.2d 882, 884 (Ill. 1999). The court interprets facially unambiguous contracts as a matter of law; however, if the court finds the language susceptible to more than one meaning, the trier of fact may interpret the contract using parol evidence. *Id.*

#### a. The SLAs

As to the SLA, VHT contends that the phrase "representing the property" unambiguously imposes a temporal limitation upon the licensees, and that the license terminates when the licensee ceases "representing the property." (VHT MPSJ at 7-10.) Zillow responds that it is at least ambiguous whether this phrase imposes a temporal limitation or merely identifies the "company," "agent," or "client" to which VHT confers a license. (Zillow MPSJ Resp. at 1-5.)

The Early SLA is the version most favorable to VHT's position because it omits reference to perpetuity and most clearly conveys that "representing the property" applies to both the "company" and the "agent." (Early SLA at VHT004071 (allowing use of the photos "in the sales or marketing of the subject property or the company/agent

representing the property").)  The court concludes that even in the early SLA, it is

ambiguous whether "representing the property" limits the temporal scope of the license

or merely identifies the "company/agent" to which it refers.  (*Id.*); *see also Cent. Ill. Light

Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004) (quoting *Platt v. Gateway Int'l

Motorsports Corp.*, 813 N.E.2d 279, 283 (Ill. App. Ct. 2004)) ("[A]n ambiguity will be

found if the language of the contract is 'obscure in meaning through indefiniteness of

expression.'").  VHT argues that this conclusion renders "representing the property"

superfluous because VHT would not license photos to an agent other than the one that

represents the property.  (VHT MPSJ Reply at 4.)  However, some of VHT's clients are

real estate brokerage firms that employ multiple real estate agents, so it would be

advantageous in a template contract to specify which agent receives the license.  Indeed,

the first section of the Early SLA confirms that "agent" warrants specification in some

contexts in the contract:  "A VHT photographer will contact the listing agent of the

applicable property."  (Early SLA at VHT004067); *see also Regency Commercial

Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007) (noting that

contracts are "to be interpreted as a whole").

　　　　VHT could have unambiguously specified to which agent its SLA confers rights:

the "company/agent [that] represents the property."  VHT also could have unambiguously

limited the temporal scope of the license that the SLA confers:  "[while] the

company/agent [is] representing the property."  The Early SLA does neither of the above

and is therefore "obscure in meaning through indefiniteness of expression." *Platt*, 813

N.E.2d at 283.  The relevant linguistic differences between versions of the SLA that the

1   parties identify—adding "in perpetuity" (Houlihan Lawrence SLA at VHT005004) and

2   referring to "Client or the agent representing the subject property" rather than the

3   "client/agent representing the property"—both favor Zillow's interpretation but do not

4   remove ambiguity.  Accordingly, the court rejects VHT's argument that the SLAs are

5   unambiguous and denies VHT's motion for summary judgment on its infringement

6   claims to the extent those claims are based on the SLAs.

7           *b.  The TOU*

8           VHT separately contends that its TOU unambiguously limits the temporal scope

9   of its licenses to conclude when the listing goes inactive.  (VHT MPSJ at 7-8.)  Zillow

10  denies that this language is unambiguous and contends that VHT fails to establish the

11  validity of its TOUs.  (Zillow MPSJ Resp. at 5-6.)

12          The court concludes that VHT fails to demonstrate as a matter of law that the TOU

13  is a binding contract.  (*See* VHT MPSJ at 3, 7-11.)  The TOU is easily accessible on

14  VHT's website, which links to the TOU from the login page, the user listings page, the

15  user dashboard, the order form, the main page, and the page specifically designed for

16  agents.  (*See* 11/18/16 Hensley Decl. (Dkt. # 180) ¶ 6, Ex. 5.)  However, when users

17  order via telephone or fax, VHT sends a confirmation email with a link to the TOU.

18  (Balduf Dep. at 542:2-11.)  That email does not indicate that the photographs are subject

19  to the TOU (*id.* at 543:12-17) and arrives only "when the[ customers] get their

20  photographs" (*id.* at 542:5-6; *see also id.* at 167:6-18 (confirming that agents do not have

21  to "sign anything" or "click a box" to agree to the TOU; rather, agents simply "have to

22  fill out [VHT's] forms and hit 'submit'")).  VHT's clients are therefore capable of

obtaining photographs without first visiting VHT's website or receiving a link to the

TOU in an email. *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 623 (Ill. 2006) ("It

simply does not matter how large the type was or how clearly the disclaimer was

expressed if the consumer did not have the opportunity to see the language before

entering into the contract to purchase the car."). Accordingly, the court concludes that a

genuine dispute of material facts exists surrounding acceptance of the terms of the TOU

for at least some portion of VHT's clients.[9] The record provides the court no basis on

which to parse which clients received legally sufficient notice of the TOU before entering

into the contract, and thus the court cannot grant summary judgment as to the

photographs that VHT argues are governed by the TOU.

Factual issues pertaining to the SLAs and TOU preclude summary judgment in

favor of VHT on its infringement claims. The court now turns to the other bases on

which the parties seek summary judgment.

4. VHT's Direct Infringement Claims

A copyright confers on its owner the exclusive right to reproduce, prepare

derivative works based on, distribute, and publicly display copies of the work. 17 U.S.C.

§ 106; *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2002). To prove

direct copyright infringement, VHT "must show ownership of the copyright and copying

_____

[9] Both VHT and Zillow assume without analysis that Illinois law applies to the TOU.
(*See* VHT MPSJ at 7; Zillow MPSJ Resp. at 5-6.) The parties presumably base that assumption
on the choice-of-law provision in the TOU. (*See* TOU at VHT093013.) It is unclear that Illinois
law governs the court's interpretation, given that Illinois law only applies by virtue of a provision
in the contract whose validity is in question. Irrespective of what law applies, factual issues
prevent summary judgment on the TOU based on broadly applicable principles of contract law.

by" Zillow.  *Kelly*, 336 F.3d at 817.  Because copyright infringement is a strict liability tort, Zillow's mental state is irrelevant to its liability.  *UMG Recordings, Inc. v. Disco Azteca Distribs., Inc.*, 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006).  However, direct infringement requires "some element of volition or causation."  *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1369-70 (N.D. Cal. 1995) ("Although copyright is a strict liability statute, there should still be some element of volition or causation[,] which is lacking where a defendant's system is merely used to create a copy by a third party.").[10]

To prevent "overzealous monopolists" from using copyrights "to stamp out the very creativity that the [Copyright] Act seeks to ignite . . . , Congress codified the doctrine of fair use."  *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (citing *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  Notwithstanding the proscriptions of Section 106, "fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  "In determining whether the use made . . .

---

[10] *See also Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2013) (quoting *Kelly*, 336 F.3d at 817) (citing *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130 (2d Cir. 2008) [hereinafter, "*Cablevision*"]) ("Infringement of the reproduction right requires 'copying *by* the defendant,' which comprises a requirement that the defendant cause the copying." (emphasis in original) (internal citations omitted)); *Cablevision*, 536 F.3d at 130-31 (analyzing *Netcom* and adopting its volitional act holding for purposes of direct infringement); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004) (concluding that the *Netcom* court "made a particularly rational interpretation of [Section] 106," especially when "applied to cyberspace," when the court "concluded that a person had to engage in volitional conduct—specifically, the act constituting infringement—to become a direct infringer"); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (citing *Netcom*, 907 F. Supp. at 1369-70).

is a fair use," the court considers the following nonexclusive factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.*; *see Stewart*, 495 U.S. at 237 (confirming that the factors are "nonexclusive").

Zillow contends that based on the volitional act doctrine and the fair use defense, it is entitled to summary judgment on VHT's direct infringement claims. (*See* Zillow MPSJ at 6-19.) VHT refutes both arguments (VHT MPSJ Resp. at 7-26) and moves for summary judgment as to liability on its direct infringement claims (VHT MPSJ at 13-19).

### a. Volitional Act Doctrine

Zillow argues that with a "relatively small number of exceptions"[11] (Zillow MPSJ at 10), VHT cannot prove that Zillow took the volitional acts required to constitute direct infringement (*id.* at 6-13). VHT responds that the volitional act doctrine, to the extent it remains viable, does not preclude Zillow's direct liability simply because Zillow designed infringing systems that operate automatically. (VHT MPSJ Resp. at 7-14.)

As a threshold matter, the court addresses the continued viability of the volitional act (or volitional conduct) doctrine following *American Broadcasting Companies, Inc. v.*

---

[11] "Zillow does not contend that the volitional act doctrine applies to the relatively small number of VHT images that it initially selected and were displayed on Digs." (Zillow MPSJ at 10.) Accordingly, the court's analysis of the volitional act doctrine sets aside those images. However, the record does not indicate the exact number of those images that VHT has copyrighted. (*Compare* Gurney Dep. at 157:25-158:5 (indicating that Zillow used "approximately 20,000" total images to found Digs), *with* Zillow MPSJ Resp. at 6 (asserting that "only about 1000 of those images belong to VHT").)

*Aereo, Inc.*, --- U.S. ---, 134 S. Ct. 2498 (2014), a recent Supreme Court decision upon which VHT bases much of its argument. (*See* MPSJ Resp. at 7-9.) The *Aereo* majority's opinion largely takes up a legislative amendment to the Transmit Clause of the Copyright Act and does not expressly address the volitional act doctrine. *See* 134 S. Ct. at 2502-11. Indeed, the majority specifically renounces extending its "limited holding" to "other technologies" that fall outside the Transmit Clause. *Id.* at 2510.

On the other hand, Justice Scalia's dissent, which Justice Thomas and Justice Alito join, fervently defends the continued viability of the volitional act doctrine. *Id.* at 2512-14 (Scalia, J., dissenting). Moreover, the "majority's analysis can be reconciled with the volitional-conduct requirement for direct infringement" because the majority held that "the distinction between active and passive participation remains a central part of the analysis of an alleged infringement." *Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1159-60 (C.D. Cal. 2015) [hereinafter, "*Fox II*"]. Accordingly, the court agrees with the *Fox II* court that "it would be folly to assume that *Aereo* categorically jettisoned [the volitional act doctrine] by implication." *Id.* at 1159-60; *see also id.* at 1169 ("*Aereo* did not fundamentally alter the volitional conduct requirement for direct infringement. More than one actor may be liable for direct infringement, but there must still be some volitional conduct for direct liability."). Whether the volitional act doctrine precludes Zillow's liability for direct infringement therefore remains a core issue in this case.

The court first rejects VHT's characterization of Zillow's website as designed "to allow users to trigger automated systems to conduct infringing acts." (VHT MPSJ Resp.

at 7 (citing *Aereo*, 134 S. Ct. 2498).)  VHT is correct that a defendant cannot hide behind

the volitional act doctrine by designing software that—although automated—"is designed

so that third parties may infringe on copyrighted material."  4 Nimmer on Copyright

§ 13.08(C)(3)(a); *Aereo*, 134 S. Ct. at 2510-11; *Smith v. BarnesandNoble.com, LLC*, 143

F. Supp. 3d 115, 122 (S.D.N.Y. 2015) ("Courts have looked to the purpose and general

use of the service in question, finding 'volitional conduct' where a service or program

was designed solely to collect and sell copyrighted material, . . . and where a program

collected material that its creators knew to be copyrighted." (internal citations omitted)).

However, Zillow's mechanisms—including its evergreen and deciduous classifications—

are designed to avoid infringing behavior, not facilitate it.  Zillow requires its users to

certify the extent to which they possess rights to utilize the photographs that they upload.

(Kutner Decl. ¶ 6.)  Zillow classifies every photograph that a customer uploads as either

evergreen or deciduous, and Zillow designed its automated system to treat photographs

accordingly.  (*Id.* ¶¶ 7-8; *see also id.* ¶ 14 (indicating that Zillow moderators review

images posted to Digs to confirm "that it contained no watermarks or other artifacts and

was otherwise of reasonably high quality").)  This system is no more designed to

facilitate infringement than a copy machine.  *See Netcom*, 907 F. Supp. at 1368-69; *see*

*also CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (reasoning that

a web host for real estate listings "is an analogue to the owner of a traditional copying

machine whose customers pay a fixed amount per copy and operate the machine

themselves to make copies"); *BarnesandNoble.com*, 143 F. Supp. 3d at 122; *Perfect 10,*

*Inc. v. Giganews, Inc.*, No. CV11 07098 AHM (SHx), 2013 WL 2109963, at *7 (C.D.

Cal. Mar. 8, 2013) ("To use *Netcom*'s analogy, Defendants here created virtual copy machines that some . . . users have used to create illegal copies. . . . Such conduct does not constitute any volitional act.").

VHT also specifically assails the "trumping rules" that Zillow instituted to determine how to classify a photograph.[12] (*See, e.g.*, MPSJ at 10-11.) Zillow allows any indication that a given photograph is evergreen to trump any number of other sources that indicate that the same photograph is deciduous. (10/25/16 Kutner Decl. ¶¶ 6-8.) VHT asserts that this procedure removes Zillow's automated process from the protection of the volitional act doctrine. (VHT MPSJ Resp. at 11.) To the contrary, Zillow's procedure merely acknowledges that different customers may have different licenses to use the same photograph, and whatever knowledge might be imputed to Zillow from the conflicting licenses is irrelevant to the strict liability tort of direct copyright infringement. *See Giganews*, 2013 WL 2109963, at *8 ("A participant in the chain of events that ultimately allows viewers to obtain infringed material does not become the 'direct cause' of the copying merely because he learns of it."); *BarnesandNoble.com*, 143 F. Supp. 3d at 123 ("This sets the instant case apart from those in which defendants were found to have engaged in volitional conduct even though a user or customer 'presses the button' to make the copy; in those cases, defendants actively encouraged and benefited from the infringing copying activity and in fact set up their services around such activity."). The

_____

[12] One type of trumping rule that Zillow implements merely determines what type of source to prefer over another—for example, an agent over an MLS and a local broker over an international broker. (Bonert Dep. at 26:10-18, 31:3-25.) This mechanism is unrelated to the direct copyright infringement that VHT alleges.

court therefore rejects the argument that Zillow's trumping rules constitute an act of volition for purposes of VHT's direct copyright infringement claims.

However, Zillow's agents and systems take several Digs-specific actions that cross the line into volitional conduct. First of all, when a user selects a photograph to post to Digs, Zillow performs a cursory human review for quality and obvious copyright issues. (*See* 10.25.16 Kutner Decl. ¶ 14; 3d Am. Compl. ¶¶ 114, 127 (citing 17 U.S.C. § 106(1)-(3), (5)).) The review for obvious copyright issues "tends only to lessen the possibility" that users will unlawfully reproduce copyrighted works. *CoStar*, 373 F.3d at 556 (characterizing a comparable manual review as a "perfunctory gatekeeping process [that] furthers the goals of the Copyright Act," and concluding that without more, such conduct could not generate direct liability). In other words, it "does not attempt to search out or select photographs for duplication; it merely *prevents* users from duplicating certain photographs." *Id.* Zillow "has not by this screening process [alone] become engaged" as a direct infringer of copyrighted works. *Id.*

However, Digs moderators also perform several tasks unrelated to avoiding copyright infringement. The moderators "confirm users' classification of the type of room depicted in a photograph, and tag the location and identity of image elements." (10.25.16 Kutner Decl. ¶ 15.) This tagging allows Zillow to code the images such that Zillow users may "request an image for display" and click the image "to show links to purchase the depicted products." (*Id.*) Moderators also review prospective Digs images to confirm they are "beautiful, inspiring, interesting, unique, or affordable." (11/14/16 Hensley Decl. ¶ 22, Ex. 21 at Zillow0074168-2.) If a moderator concludes an image is

too small, cluttered, dark, basic, or "spam-like," the moderator flags the image to ensure it is not posted publically on Digs.  (*Id.* at Zillow0074168-3.)

In addition, Zillow designed Digs to "implicitly dig" images.  (Gurney Dep. at 38:25-39:13.)  This functionality saves images to Digs when users begin but fail to complete the "digging" process.  (*Id.*)  In that instance, Zillow may properly be deemed the selector of the content for copying.  *See Aereo*, 134 S. Ct. at 2513 (Scalia, J., dissenting) (concluding that volition "will come down to who selects the copyrighted content:  the defendant or its customers").  The combination of the "implicit digs" functionality and human moderation leads the court to conclude that as to Digs, Zillow actions are "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies."  *Cablevision*, 536 F.3d at 132.

In sum, the lack of evidence of volitional conduct by Zillow precludes its liability for direct infringement on HDPs.  *See Aereo*, 134 S. Ct. at 2514 (Scalia, J., dissenting) ("The distinction between direct and secondary liability would collapse if there were not a clear rule for determining whether the *defendant* committed the infringing act.").  The court therefore grants Zillow's motion for summary judgment as to direct infringement on HDPs.  However, several aspects of Digs evince the requisite volitional conduct required for direct liability.  The court therefore denies summary judgment on that basis and proceeds to analyze whether fair use applies to the photographs that Zillow makes searchable on Digs.

//

//

*b. Fair Use*

Zillow contends that the fair use doctrine shields Zillow from liability for the images that it has made searchable on Digs. (Zillow MPSJ at 13-19.) "Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). If the material facts are not in dispute, the court may decide the fair use question on summary judgment. *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986). Congress directs the court to consider the following nonexclusive factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. Beyond this "very broad statutory explanation of what fair use is and some of the criteria applicable to it," however, the court is "free to adapt the doctrine to particular situations on a case-by-case basis." H.R. Rep. No. 94-1476, at 5680 (1976).

The first factor—the purpose and character of Zillow's use—favors VHT. *See* 17 U.S.C. § 107(1). Tagging photographs of housing is minimally transformative. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (stating that transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright"). Zillow has added a minor functionality, but unlike in the cases Zillow cites for support, the photographs' primary purpose—to artfully depict home scenes—remains unaltered. *Cf. Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th

Cir. 2002) (concluding that making smaller, thumbnail versions of images "served an entirely different function" than the original images because they could not reasonably be put to aesthetic purposes); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164-65 (9th Cir. 2007) (same); *see Worldwide Church of God v. Phil. Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) (quoting *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)) ("[W]here the 'use is for the same intrinsic purpose as [the copyright holder's] . . . such use seriously weakens a claimed fair use.'" (second alteration in original)). For instance, in *Amazon.com*, reducing full-scale photographs into thumbnail images transformed the images, which were "created originally to serve an entertainment, aesthetic, or informative function, into "a search engine." *Amazon.com*, 508 F.3d at 1165. Here, simply tagging existing photographs does not transform the images "into a new creation." *Wall Data*, 447 F.3d 769, 778 (9th Cir. 2006). In addition, the manner in which Digs' tagging is transformative is partially commercial. *See Campbell*, 510 U.S. at 579 (reasoning that "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use"). Accordingly, the court concludes that this factor counsels against a finding of fair use.

The second and third fair use factors also slightly favor VHT. *See* 17 U.S.C. § 107(2)-(3). "Works that are creative in nature are 'closer to the core of intended copyright protection' than are more fact-based works." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001) (quoting *Campbell*, 510 U.S. at 579). Where, as here, a photograph has already been published, "the artist's expression has already

occurred" and the "nature of the copyrighted work" factor therefore operates with less force. *Kelly*, 336 F.3d at 820. The third factor—amount and substantiality of the portion used—varies in importance depending on the "purpose and nature of the use." *Id.* In *Kelly*, the Ninth Circuit reasoned that "[t]his factor neither weighs for nor against either party because, although [the defendant] did copy each of [the plaintiff's] images as a whole, it was reasonable to do so in light of [the defendant's] use of the images." *Id.* at 821. Here, however, it was unnecessary to use the entirety of the image—at least, not to the extent the full photograph must be used to create a thumbnail image.[13] *Id.* Accordingly, the court concludes that the third factor also slightly favors VHT.

The fourth element—effect of use on the potential market—is neutral. *See* 17 U.S.C. § 107(4). VHT argues that it "has been exploring" using the images in its "fledgling licensing program" for "home design websites—exactly what the Digs Site is." (VHT MPSJ Resp. at 23.) On one hand, this market is "hypothetical." *Amazon.com*, 508 F.3d at 1168. On the other hand, the court's conclusion that Digs is minimally transformative suggests that it is likely to impinge on the market for VHT's photographs. *See Kelly*, 336 F.3d at 821 ("A transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work."). The court concludes that this factor is neutral.

_____

[13] Zillow argues that "[t]aking just the portion of an image that depicted a product would defeat the purpose of Digs, which is to allow users to search for whole room ensembles incorporating various searchable elements." (Zillow MPSJ Reply at 14.) The argument that the "whole room ensembles" are essential to Digs' purpose further minimizes the extent to which Zillow's use is transformative.

In light of the court's analysis of these four factors and "the purposes of copyright," *Campbell*, 510 U.S. at 578, the court concludes as a matter of law that Digs' searchable functionality does not constitute a fair use.[14] The court therefore grants summary judgment in favor of VHT on that issue.[15]

### 5. VHT's Indirect Infringement Claims

VHT asserts claims for contributory infringement by material contribution (Am. Compl. ¶¶ 132-42), contributory infringement by inducement (*id.* ¶¶ 143-50), and vicarious infringement (*id.* ¶¶ 151-59); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement . . . and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it . . . ." (internal citations omitted)). All three of those indirect infringement claims stem from Zillow's use of VHT's photographs on Digs. (*See id.* ¶¶ 132-59.) VHT seeks summary judgment as to liability for indirect infringement (VHT MPSJ at 15-18), but the court has rejected its argument based on the ambiguous licenses at issue, *see supra* § III.B.2. The

---

[14] Although not all facts pertaining to fair use are undisputed (*see, e.g.*, Zillow MPSJ Resp. at 19-20 (raising several disputed facts)), none of the genuinely disputed facts could "affect the outcome," and those facts are therefore not material, *Anderson*, 477 U.S. at 248.

[15] Zillow also asks the court to determine that the fair use doctrine protects "Zillow's scaling, cropping, and enhancing of images." (Zillow MPSJ at 14-15; *see also* VHT MPSJ Resp. at 23-25; Zillow MPSJ Reply at 15-17.) The parties appear to agree as to most but not all applications of Zillow's argument. (*See* VHT MPSJ Resp. at 24 (beginning VHT's response to Zillow's argument by identifying what "VHT has never alleged" and "does not contest").) The court concludes that the extent to which this issue is in dispute is not identified with sufficient clarity. Accordingly, the court will hold VHT to the representations and concessions it makes in its briefing (*see id.* at 23-25) but declines to consider whether fair use broadly protects "Zillow's scaling, cropping, and enhancing of images" (Zillow MPSJ at 14).

court therefore analyzes below Zillow's motion for summary judgment as to all three of VHT's indirect infringement claims.  (Zillow MPSJ at 19-21.)

### a. Contributory Infringement

"[O]ne contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 78, 795 (9th Cir. 2007).  VHT asserts two contributory infringement claims, one on the theory that Zillow materially contributes to another's infringement and the other on the theory that Zillow induces another's infringement.  (Am. Compl. ¶¶ 132-50.)  Zillow argues that VHT's contributory infringement claims fail because VHT has no evidence that Zillow had knowledge of the purportedly infringing photographs.  (Zillow MPSJ at 19-20.)

The court concludes that the record is insufficiently clear regarding knowledge to warrant summary judgment on that basis.  Zillow demonstrates that its systems do not independently ascertain infringing photographs.  (10/25/16 Kutner Decl. ¶ 9.)  The record contains evidence that in early 2013, VHT began discussions with Zillow regarding licensing VHT's photographs to display on Digs.  (Balduf Dep. at 297:8-299:13; 10/25/16 Hensley Decl. ¶ 6, Ex. E ("Acker Dep.") at 254:6-255:17.)  On July 10, 2014, VHT informed Zillow of "thousands of VHT images on [Zillow's] website" that, pursuant to VHT's interpretation of the SLA and TOU, were being displayed in violation of VHT's copyrights.  (10/25/16 Crosby Decl. ¶ 17, Ex. 16 ("7/10/14 Letter") at 1.)  To that letter, VHT attached a "spreadsheet that specifically identifie[d] VHT's images by property address."  (*Id.* at 2.)

Zillow analyzed the spreadsheet and concluded that "as many as thirty percent of the images" were wrongfully identified. (10/25/16 Crosby Decl. ¶ 18, Ex. 17 ("7/21/14 Letter") at 1.) The parties engaged in a back-and-forth in an effort to ascertain which of the images on Digs belong to VHT and identify discrepancies between the parties' methodology. (*See* 10/25/16 Crosby Decl. ¶ 19, Ex. 18.) That exchange continued into the summer of 2016. (*See id.*)

Based on this convoluted and disputed chronology, Zillow seeks summary judgment on the basis that "VHT is unlikely to be able [sic] prove that Zillow received adequate notice of most, if any[,] alleged infringements on Digs before extremely recently." (Zillow MPSJ at 20.) Zillow's allusion to likelihood evinces the lack of clarity in the factual record that precludes summary judgment on the knowledge element, which is common to both of VHT's contributory infringement claims. Zillow has not demonstrated VHT's inability to put forward legally sufficient evidence of knowledge as to at least a portion of the images posted to Digs, and Zillow does not parse its argument in a manner that renders the court capable of considering partial summary judgment on these claims. (*See id.* at 19-20.) Because knowledge is the only element of VHT's contributory infringement claims that Zillow raises, the court denies summary judgment on this claim.

### b. Vicarious Infringement

To be liable for vicarious infringement, Zillow must have "the right and ability to supervise the infringing conduct" and "a direct financial interest in the infringing activity." *Visa Int'l*, 494 F.3d at 802 (internal footnote omitted). In this context,

"supervise" refers to the defendant's ability to "control" and "police" the activities of its users. *Id.* at 802 n.13 (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001)); *see also id.* at 805; *Grokster*, 545 U.S. at 930 ("One . . . infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it."). A necessary component of the requisite control is the defendant's "practical ability" to "stop or limit the directly infringing conduct." *Amazon.com*, 508 F.3d at 1173.

Zillow argues that it does not have the practical ability to supervise, *Visa Int'l*, 494 F.3d at 802, stop, or limit the directly infringing conduct, *Amazon.com*, 508 F.3d at 1173, and that it thus cannot be liable for vicarious infringement (Zillow MPSJ at 20). Zillow asserts that it lacks any practical method for identifying the copyright-holder of an image as the image is uploaded. (10/25/16 Kutner Decl. ¶ 9.) Upon notice from VHT, however, Zillow could have removed the offending photographs. As the court has analyzed above, *see supra* § III.B.5.a., when and to what extent VHT placed Zillow on notice of which photographs allegedly infringed VHT's copyrights is a disputed question of fact appropriately left to the jury. Accordingly, the court denies summary judgment on that basis.

Zillow also argues that VHT cannot show that Zillow "received a 'direct financial benefit from the [alleged direct] copyright infringement,'" and Zillow therefore seeks summary judgment on that basis as well. (Zillow MPSJ at 20 (quoting *Ellison*, 357 F.3d at 1079).) On Digs, VHT's photographs routinely appear next to paid advertising. (*See* 10/25/16 Hensley Decl. ¶ 26, Ex. Y at 1-2; Acker Dep. at 344:19-346:5; 10/25/16

Hensley Decl. ¶ 9, Ex. H ("Bruno Dep.") at 49:4-9.) It is reasonable to infer that Zillow receives some portion of advertising revenue as a result of the customers that VHT's photographs draw to the website. Thus, notwithstanding the relatively small proportion of VHT-copyrighted photographs on Digs, the court concludes that a fact-finder could reasonably find that those photographs constitute a "'draw' for customers." *Fonovisa*, 76 F.3d at 263; *see also Ellison*, 357 F.3d at 1079 ("There is no requirement that the draw be 'substantial.'"). There exists, therefore, a genuine dispute of material fact as to the "direct financial benefit" element of VHT's vicarious infringement claim. *See Ellison*, 357 F.3d at 1079. Because a triable issue of material fact exists as to both elements of VHT's vicarious infringement claim, the court denies summary judgment on that claim.

### 6. Safe Harbor

VHT seeks summary judgment on Zillow's Digital Millennium Copyright Act ("DMCA") safe harbor affirmative defense. Title II of the DMCA establishes safe harbors to shield certain passive internet activity from liability for copyright infringement. 17 U.S.C. § 512; *see also Ellison v. Robertson*, 357 F.3d 1072, 1076-77 (9th Cir. 2004). One such protection is for "[i]nformation residing on systems or networks at direction of users." 17 U.S.C. § 512(c). To fall into that safe harbor, however, that information must have been "stor[ed] at the direction of a user." *Id.* § 512(c)(1). Zillow selected and posted the photographs that it used to found Digs. (*See* Gurney Dep. at 157:25-158:16.) At oral argument, Zillow conceded that its safe harbor argument does not apply to the photographs that Zillow selected and used to found Digs.

1    Accordingly, the court grants VHT summary judgment on Zillow's DMCA safe harbor

2    defense regarding those images.

3           As to the images that were stored at the direction of a user—the vast majority of

4    images at issue in this suit—the court has already concluded that a jury must determine

5    the scope of VHT's SLAs and denied summary judgment as to VHT's TOU-based

6    infringement claims.  *See supra* § III.B.2.  For the same reasons, the record does not

7    show beyond genuine dispute that Zillow had sufficient knowledge of infringement to

8    preclude safe harbor.  *See, e.g.*, 17 U.S.C. § 512(c)(1)(A) (describing the types of

9    knowledge of infringing behavior that entitle a service provider to DMCA safe harbor

10   protections).  The court therefore concludes that as to images that Zillow stored at the

11   direction of a user, factual issues preclude summary judgment regarding Zillow's DMCA

12   safe harbor defense.

13           7.  Zillow's Counterclaims

14           Zillow's counterclaims principally implicate the template email that VHT

15   distributed as a cover letter to its SLA.  (*See* Cover Email at VHT013819.)  For the

16   reasons articulated below, the court concludes that VHT is entitled to summary judgment

17   on all four of Zillow's counterclaims.

18           a.  *CPA Counterclaim*

19           To prove that VHT violated the CPA, Zillow must demonstrate (1) that VHT

20   engaged in an "unfair or deceptive act or practice; (2) occurring in trade or commerce; (3)

21   [which has a] public interest impact; (4) [the plaintiff suffered injury] in his or her

22   business or property; [and] (5) causation."  *Klem v. Wash. Mut. Bank*, 295 P.3d 1179,

1187-88 (Wash. 2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (1986)).  Zillow asserts that VHT committed an unfair or deceptive act or practice by emailing potential clients and misinforming them of the scope of the photography license that VHT conveys.  (Counter-Compl. ¶ 13.)  VHT argues that the undisputed facts demonstrate that this action fails to satisfy several elements of a CPA claim.  (VHT MPSJ at 25.)

The court concludes that VHT fails to satisfy the "public interest impact" element of a CPA claim.  *Hangman Ridge*, 719 P.2d at 533.  Where, as here, the subject transaction is "essentially a private dispute . . . , it may be it may be more difficult to show that the public has an interest in the subject matter."  *Id.* at 538.  The court considers the following factors to determine whether an "essentially private transaction" satisfies the public interest element:  "(1) whether defendant was acting in the course of his or her business, (2) whether defendant advertised to the general public, (3) whether defendant actively solicited this plaintiff, and (4) whether the parties were unequal bargainers."  *Hangman Ridge*, 719 P.2d at 539-40.

Here, VHT emailed only real estate professionals, who are sophisticated parties capable of reading contracts and interpreting their language.  *See Pac. Nw. Life Ins. Co. v. Turnbull*, 754 P.2d 1262, 1269 (Wash. Ct. App. 1988) (affirming the dismissal of a CPA claim where plaintiff "had sufficient sophistication to remove them from the class of bargainers subject to exploitation").  VHT attached the SLA to the email, which served only as a "cover letter introducing the SLA to prospective clients."  (Balduf Dep. at 99:7-10; *see also id.* at 94:6-7, 99:22-100:2.)  VHT did not advertise in this manner "to

the general public" and was not an "unequal bargainer[]" with the email recipients. *Hangman Ridge*, 719 P.2d at 539-40 ("Plaintiffs in this case are not representative of bargainers subject to exploitation and unable to protect themselves."); *see Segal Co. (Eastern States), Inc. v. Amazon.com*, 280 F. Supp. 2d 1229, 1234 n.5 ("[T]he Legislature passed the CPA to shield the *regular consumer* from deception.").  Although VHT acted in the course of its business, the court concludes in light of the other factors that VHT's essentially private transaction with real estate agents, brokers, and MLSs does not satisfy the public interest element of the CPA.  *See id.* at 540 (concluding that the public interest element was not met despite the fact that the defendant "was undeniably acting within the scope of its business").  Because Zillow fails to show a public interest impact, the court grants VHT summary judgment on Zillow's CPA counterclaim.

### b.  CFAA Counterclaim

A party violates the CFAA when it "knowingly causes the transmission of . . . information, . . . and as a result of such conduct, intentionally causes damage without authorization to a protected computer."  18 U.S.C. § 1030(a)(5)(A).  Under the CFAA, damage means "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  Zillow claims that VHT violated this provision in the same manner alleged in Zillow's CPA counterclaim—by misleading VHT licensees and causing them to post photos to Zillow's website.  (*See* Counter-Compl. ¶ 28.)  Zillow asserts that VHT's violation caused damage by "causing [Zillow's] computer systems to contain photographs whose attribution of rights is inconsistent with the asserted rights of the claimed rights holder."  (*Id.* ¶ 29.)

Even assuming that VHT knowingly caused the transmission of photographs to Zillow's computers, that transmission did not impair the integrity or availability of data on Zillow's computers. Rather, the transmission of photographs merely added benign data to Zillow's computers. Sending benign data, without more, does not impair the integrity or availability of data on Zillow's computers. "Damage under the CFAA does not occur simply by 'any use or consumption of a device's limited resources,' but rather any 'damage' must arise from an impairment or performance 'that occurs when the cumulative impact of all [unauthorized transmissions] exceeds the device's finite capacity so as to result in a slowdown . . . .'" *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1067 (N.D. Cal. 2012) (quoting *Czech v. Wall Street on Demand, Inc.*, 674 F. Supp. 2d 1102, 1115 (D. Minn. 2009)); *cf. Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 641 (S.D.N.Y. 2011) (concluding that the plaintiffs sufficiently alleged damages under the CFAA where they asserted that defendants knowingly transmitted "reset packets" that throttled data exchange and inhibited computer use). To conclude otherwise would contravene the plain meaning of the CFAA and render the damages requirement of Section 1030(a)(5)(A) superfluous. *See, e.g.*, *McDonnell v. United States*, --- U.S. ---, 136 S. Ct. 2355, 2369 (2016) (explaining the presumption against superfluity).

Zillow does not provide any evidence—or even allege—that the photographs slowed or inhibited the operations of its computers. Instead, in support of the damages element, Zillow argues only that "corrupting data" is sufficient to constitute damage. (Zillow MPSJ Resp. at 28 (citing *eBay Inc. v. Dig. Point Sols., Inc.*, No.

C 08-4052 JF (PVT), 2009 WL 2523733, at *6 (N.D. Cal. Aug. 17, 2009) [hereinafter, *eBay II*]).)  In *eBay II*, however, the defendant allegedly corrupted data that existed separately from the data that the defendant transmitted.  *See eBay II*, 2009 WL 2523733, at *6.  Here, there is no evidence that the data had any impact—aside from mere presence—on Zillow's computers.  Accordingly, the court grants VHT summary judgment on Zillow's CFAA counterclaim.

### c.  *Trespass to Chattels Counterclaim*

Trespass to chattels "is the intentional interference with a party's personal property without justification that deprives the owner of possession or use." *Sexton v. Brown*, 147 Wash. App. 1005, 2008 WL 4616705, at *5 (Wash. Ct. App. Oct. 20, 2008) (unpublished) (citing Restatement (Second) of Torts § 217 (1965)).[16]  There exists minimal published Washington case law on trespass claims pertaining to computers.  However, under California's trespass law, which also tracks the Second Restatement of Torts, "the defendant's use of the plaintiff's computer system [has been] held sufficient to support an action for trespass when it actually did, or threatened to, interfere with the intended functioning of the system, as by significantly reducing its available memory and processing power." *Intel Corp. v. Hamidi*, 71 P.3d 296, 306 (Cal. 2003); *see also In re iPhone*, 844 F. Supp. 2d at 1069.  "Short of dispossession, personal injury, or physical damage . . . , intermeddling is actionable only if 'the chattel is impaired as to its

---

[16] "[W]e may consider unpublished state decisions, even though such opinions have no precedential value." *Emp'rs Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

condition, quality, or value, or . . . the possessor is deprived of the use of the chattel for a substantial time.'" *Intel*, 71 P.3d at 306 (quoting Restatement (Second) of Torts § 218).

For the same reasons the court concludes that the undisputed evidence precludes Zillow's CFAA counterclaim, the court grants VHT summary judgment on Zillow's trespass counterclaim. Even assuming VHT induces its licensees to upload photographs to Zillow.com and misrepresents the scope of their licenses to Zillow, that upload does not impair Zillow.com "as to its condition, quality, or value." Restatement (Second) of Torts § 218(b). Indeed, as currently used, the photographs augment the quality and value of Zillow.com and Digs. Accordingly, the court concludes that Zillow's trespass to chattels counterclaim fails as a matter of law and grants VHT summary judgment on that counterclaim.

### d. Tortious Interference Counterclaim

Tortious interference with a contract "requires five elements: (1) the existence of a valid contractual relationship . . . ; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship . . . ; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997). Zillow contends that VHT induces Zillow's clients to breach their agreements with Zillow by "plac[ing] photographs on Zillow's computers in association with sources for which Zillow has received warranties and/or assurances of rights under those contracts that are inconsistent with VHT's asserted understanding of its licenses." (Counter-Compl. ¶ 39.) VHT specifically challenges whether Zillow has

evidence that "VHT's 'conscious objective' was to interfere with Zillow's contracts with VHT's licensees." (VHT MPSJ at 30.) Zillow responds that "[t]here is no more merit to VHT's arguments regarding causation and intent on this claim than there is respecting the others." (Zillow MPSJ Resp. at 29.)

VHT challenged Zillow's ability to "produce admissible evidence to support" intent. Fed. R. Civ. P. 56(c)(1)(B). Zillow's response consists of one conclusory sentence without citation to the record. (Zillow MPSJ Resp. at 29.) For the first time at oral argument, Zillow referred the court to (1) VHT's 30(b)(6) deposition testimony, which explains that VHT sends the email to prospective clients as "an introduction to the [SLA]" (*see* Balduf Dep. at 91:10-19, 98:2-7), and (2) an internal VHT email expressing concern that that the cover email "could be taken out of context on its own and used against [VHT]" (11/14/16 Crosby Decl. ¶ 13, Ex. 12 at VHT014509). Even if this evidence had been properly presented, it does not create a genuine dispute as to whether VHT "acted for the primary purpose of interfering with [Zillow's] contract[s]" or "kn[ew] that the interference [wa]s certain or substantially certain to occur as a result of his action." *Plumbers and Steamfitters Union Local 598 v. Wash. Pub. Power Supply Sys.*, 724 P.2d 1030, 1042 (Wash. Ct. App. 1986).

Zillow put forth no evidence of VHT's intent, nor can such intent be reasonably inferred from the evidence VHT belatedly referenced. Accordingly, the court grants VHT summary judgment on Zillow's counterclaim for tortious interference.

//

//

## C. Expert Exclusion

Although the briefing on the parties' dispositive motions occasionally references the expert opinions prepared in this matter, none of those opinions impacted the court's analysis herein. Accordingly, the court defers ruling on the motions to exclude certain expert testimony.

## D. Sealing Documents and Order

The parties have moved to seal numerous parts of the record. (*See* Mots. to Seal.) Those motions are largely unopposed. (*See id.*) Moreover, the parties demonstrate that they have filed under seal only the documents and specific portions thereof that overcome both the Ninth Circuit's and the Western District of Washington's strong presumption of public access to the court's files. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179-80 (9th Cir. 2006) (explaining that a party must show "compelling reasons" to seal documents attached to dispositive motions); Local Rules W.D. Wash. LCR 5(g). Accordingly, the court grants each of the motions to seal and directs the clerk to retain the seal on those documents.

The court further directs the Clerk to file this order provisionally under seal. The court orders counsel to meet and confer regarding which, if any, portions of this order they seek to have redacted. Counsel must then submit one joint statement or, if they cannot agree on a joint statement, two competing statements indicating any portions of the order they seek to have redacted and on what basis. *See Kamakana*, 447 F.3d at 1179-80. The statement or statements must attach a proposed redacted order that incorporates the redactions requested in the corresponding statement. Any such

statement is due to the court by January 6, 2016. The court will consider any requests to redact and then file the order on the docket with any necessary redactions.

**E.      Draft Jury Instructions**

The court alters the deadline for submitting proposed jury instructions. *See* Local Rules W.D. Wash. LCR 51. The parties must submit their proposed jury instructions no later than 12:00 p.m. on Monday, January 9, 2017.

## IV.      CONCLUSION

Based on the foregoing analysis, the court DENIES Zillow's motion for judgment on the pleadings (Dkt. ## 98, 99), GRANTS in part and DENIES in part Zillow's motion for summary judgment (Dkt. # 129), GRANTS in part and DENIES in part VHT's motion for partial summary judgment (Dkt. ## 137, 141), DEFERS ruling on the motions to exclude expert testimony (Dkt. ## 125, 131), and GRANTS the various motions to seal (Dkt. ## 127, 134, 136, 162, 170, 197, 204).

The court GRANTS VHT leave to file a renewed motion on its unregistered copyrights, subject to the conditions and limitations described above.

The court ORDERS the parties to file their proposed jury instructions no later than 12:00 p.m. on January 9, 2017.

Finally, the court DIRECTS the Clerk to file this order provisionally under seal and ORDERS counsel to meet and confer regarding the need for redaction and to indicate

//

//

//

any such need as described above.

Dated this 23rd day of December, 2016.

JAMES L. ROBART
United States District Judge

ORDER - 50