1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

VHT, INC.,                                     CASE NO. C15-1096JLR

11                          Plaintiff,          FINDINGS OF FACT AND
                                                CONCLUSIONS OF LAW
         v.
12
     ZILLOW GROUP, INC., et al.,
13
                            Defendants.
14

15              **I.      INTRODUCTION**

16       This matter was tried to the court on the parties' briefing and oral closing

17  arguments.  (*See* VHT Br. (Dkt. # 362); Zillow Br. (Dkt. # 361); VHT Resp. (Dkt. # 364);

18  Zillow Resp. (Dkt. # 363); VHT Reply (Dkt. # 368); Zillow Reply (Dkt. # 371); VHT

19  Supp. Br. (Dkt. # 370); Zillow Supp. Br. (Dkt. # 369); 12/14/21 Min. Entry (Dkt. # 377).)

20  The parties also filed proposed findings of fact and conclusions of law and proposed

21  judgments.  (*See* VHT F&C (Dkt. # 381); VHT Prop. J. (Dkt. # 382); Zillow F&C (Dkt.

22  # 383); Zillow Prop. J. (Dkt. # 385.)  At issue is whether Defendants Zillow Group, Inc.

and Zillow, Inc.'s (collectively, "Zillow") infringement of 2,700 of Plaintiff VHT, Inc.'s ("VHT") images on its Digs website was innocent, and the amount of statutory damages to which VHT is entitled for that infringement. The court has considered the parties' briefing, the exhibits admitted into evidence, the arguments of counsel, and the parties' proposed findings of fact and conclusions of law. Being fully advised, and pursuant to Federal Rule of Civil Procedure 52(a), the court (1) finds that Zillow's infringement of 388 of VHT's images prior to July 10, 2014 was innocent; (2) finds that Zillow's infringement of 2,312 of VHT's images after July 10, 2014 was not innocent; and (3) awards VHT statutory damages totaling $1,927,200.

## II.   PROCEDURAL BACKGROUND

This action arises from Zillow's use of VHT's copyrighted real estate photos on its Digs website and is before the court following remand by the Ninth Circuit Court of Appeals. *See VHT, Inc. v. Zillow Grp.*, *Inc.*, 918 F.3d 723, 730 (9th Cir.), *cert. denied*, 140 S. Ct. 122 (2019).

This case was originally tried to a jury between January 23, 2017, and February 9, 2017. (*See generally* Dkt.) Relevant to the issues currently before the court, the jury found that (1) Zillow directly infringed 28,125 of VHT's images it were used on Digs (Verdict Form (Dkt. # 281) at 1-2); (2) 19,132 of VHT's images had independent value (*id.* at 5); (3) VHT was entitled to $2.84 in actual damages per infringed image (*id.* at 4); (4) Zillow willfully infringed 3,373 of VHT's images and was liable to VHT for $1,500 in statutory damages per willfully infringed image (*id.* at 6); and (5) Zillow innocently infringed 15,939 of VHT's images and was liable to VHT for $200 in statutory damages

per innocently infringed image (*id.*).  The jury did not find that any of the images were neither willfully nor innocently infringed.  (*See generally id.*)  VHT elected to receive statutory damages in lieu of actual damages for those images that were eligible for statutory damages.  (*See* Election (Dkt. # 286).)

    After trial, Zillow moved for judgment notwithstanding the verdict or for a new trial.  (*See* JNOV Mot. (Dkt. # 301).)  The court upheld the jury's verdict that Zillow directly infringed VHT's copyright in searchable images that had been displayed on Digs, including the 2,700 images at issue in this bench trial.  (6/20/17 Order (Dkt. # 315) at 46.)  The court also upheld the jury's verdict that Zillow's infringement of these images was willful.  (*Id.*)  The court, however, reversed the jury's verdict that Zillow had infringed images that were nonsearchable and granted a new trial on VHT's indirect copyright infringement claims as to 114 of VHT's images.  (*Id.*)  On June 27, 2017, the parties stipulated and agreed to waive their rights to file motions for costs and for attorney's fees and to the dismissal without prejudice of VHT's indirect copyright infringement claims as to the 114 images for which the court had granted a new trial.  (*See* 6/27/17 Joint Sub. (Dkt. # 316).)  The court entered final judgment on July 10, 2017.  (*See* 7/10/17 J. (Dkt. # 322).)

    The parties filed cross-appeals.  *See VHT*, 918 F.3d at 730.  Relevant to the issues currently before the court, the Ninth Circuit reversed the court's denial of judgment notwithstanding the verdict on the issue of willfulness as to the 2,700 images for which the court had affirmed the jury's verdict; vacated the jury's finding of willful infringement of those images; and remanded for consideration of whether VHT's photos

1    used on Zillow's Digs site were part of a compilation or were individual "works" under

2    the Copyright Act.  *Id.* at 747-50.  Whether Zillow's infringement of the 2,700 images at

3    issue in this case was innocent was not before the Ninth Circuit.  *See generally id.*

4         After remand, this court held, in relevant part, that VHT's images that Zillow used

5    on Digs did not constitute a "compilation" within the meaning of 17 U.S.C. § 101 and

6    therefore did not comprise a single "work" for purposes of calculating statutory damages

7    under 17 U.S.C. § 504(c).  (5/8/2020 Order (Dkt. # 347) at 25-35.)  The court ordered the

8    parties to submit a joint statement regarding the parties' positions as to the remaining

9    issues left for adjudication and a proposed amended judgment.  (*Id.* at 36.)  After

10   reviewing the parties' joint statement, the court held that a new trial was necessary to

11   determine (1) whether or not Zillow's infringement of the 2,700 images for which the

12   Ninth Circuit vacated the jury's willfulness finding was innocent and (2) the measure of

13   statutory damages.  (3/10/21 Order (Dkt. # 351) at 12.)

14        The parties subsequently agreed that these issues would be tried to the bench

15   based on briefing, oral argument, and testimony and evidence admitted at the previous

16   jury trial.  (*See* 8/12/21 Order (Dkt. # 359) (granting the parties' stipulated motion

17   regarding trial procedure).)  The parties submitted briefing, and the court heard closing

18   arguments on December 14, 2021.  (*See* 12/14/21 Min. Entry.)  After oral argument, the

19   parties submitted proposed findings of fact and conclusions of law and proposed

20   judgments.  (*See* VHT F&C; VHT Prop. J.; Zillow F&C; Zillow Prop. J.)  Being fully

21

22

1   advised, and pursuant to Federal Rule of Civil Procedure 52(a), the court now makes the

2   following findings of fact and conclusions of law.[1]

### III.    FINDINGS OF FACT

**A.    The Parties**

5       1.    <u>VHT</u>

6       1.    VHT is a Delaware corporation with its principal place of business in

7   Rosemont, Illinois.  (Trial Ex. 600 ¶ 1.)  Its primary business involves the creation and

8   curation of photographs of residential real properties listed for sale, and its primary

9   source of revenue is the licensing of those photographs to real estate brokers and agents.

10  (*Id.* ¶ 2; Balduf Tr. (Dkt. # 290) at 67:23.)

11      2.    VHT has a network of professional real estate photographers.  (Trial Ex.

12  600 ¶ 7.)  When a broker or agent requests that VHT obtain and license photos of a

13  residential real estate property, VHT dispatches one of the photographers in its network

14  to shoot photographs of that property.  (*Id.* ¶ 8.)  VHT owns valid copyrights in the

15  photographs that are the subject of this action and therefore has the exclusive right to

16  reproduce and display them.  (*Id.* ¶ 9); *see* 17 U.S.C. § 106.

17      3.    VHT's service level agreements and terms of use grant its customers the

18  right to use the images in connection with selling or marketing a specific property.  Its

---

[1] To the extent any of the court's findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law.  Similarly, to the extent any of the court's conclusions of law may be deemed findings of fact, they shall also be considered findings of fact. *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

licenses to larger brokerage firms also grant the right to use the images to market the agent representing the property.  VHT's licenses do not permit any other use without VHT's express permission.  (Trial Exs. 7, 476 (service level agreements); 2 (terms of use); Balduf Tr. at 77:19-80:23, 83:25-84:20, 86:18-87:25).)

>    2.    Zillow

>    4.    Zillow operates the largest real estate website in the United States.  (Acker Tr. (Dkt. # 291)[2] at 177:14-17).  It owns and maintains a database which, at the time of the parties' 2017 trial, contained information about more than 110 million homes in the United States.  (Trial Ex. 600 ¶ 10.)

>    5.    Zillow's managers and executives have substantial experience with copyright and the licensing of content for its website.  (*See, e.g.*, Samuelson Tr. (Dkt. # 294) at 131:11-18; Acker Tr. (Dkt. # 291) at 177:10-17; 178:10-180:12; Schwartz Tr. (Dkt. # 293) at 6:15-57:10.)

>    6.    Zillow obtains images used on its websites through feed agreements with hundreds of Multiple Listing Services ("MLSes") and thousands of real estate brokers and agents.  (Acker Tr. (Dkt. # 292) at 32:21-33:8.)  It receives between three and five million photos every day through these feeds.  (Gurney Tr. (Dkt. # 292) at 120:13-16.)

>    7.    Zillow's agreements with its feed providers grant it an express license to use, copy, distribute, publicly display, and create derivative works for each photo, and the

---

[2] The testimony of Kristin Acker, Zillow's Vice President of Product Teams, spanned two days during the parties' 2017 trial.  Accordingly, the court includes the docket number for the appropriate transcript in each citation to Ms. Acker's testimony.

1   agreements include unambiguous representations by the feed providers that they have the

2   authority to assign such rights. *VHT*, 918 F.3d at 749;[3] (*see also* Trial Ex. A-77 ¶ 3

3   (example feed agreement, stating that the feed provider grants to Zillow a "nonexclusive,

4   royalty-free license to use, copy, distribute, publicly display and perform, and create

5   derivative works . . .only on in and in connection with the operation, marketing and

6   promotion of the web sites and other properties owned, operated or powered by Zillow or

7   its authorized licensees."); *id.* ¶ 4 (stating the feed provider has "all necessary rights and

8   authority" to grant Zillow these rights "on behalf of any third parties")).  The feed

9   providers further promised to indemnify Zillow against claims of third parties arising

10  from the provider's breach of its warranty that it is able to assign these rights.  (Trial Ex.

11  A-77 ¶ 4.)

12          8.      The feed agreements also specify whether Zillow's right to use the photos

13  is temporally limited.  Zillow characterizes as "evergreen" photos from feed agreements

14  that grant a right to display an image in perpetuity; it classifies as "deciduous" photos

15  from feed agreements that require Zillow to cease displaying the photos after the

16  corresponding property is sold or taken off the market.  (Acker Tr. (Dkt. # 292) at

17  

18      [3] Although the Ninth Circuit did not make express findings of fact, it reviewed the jury's
    verdict to determine whether it was supported by substantial evidence—that is, "'evidence
    adequate to support the jury's conclusion, even if it is also possible to draw a contrary

19  conclusion.'" *VHT*, 918 F.3d at 735 (quoting *Unicolors, Inc., v. Urban Outfitters, Inc.*, 853 F.3d
    980, 991 (9th Cir. 2017)).  Under this standard, the court will "uphold the verdict unless 'the

20  evidence permits *only one* reasonable conclusion, and that conclusion is contrary to the jury's
    verdict.'" *Id.* (quoting *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007); and

21  citing Fed. R. Civ. P. 50(a)) (emphasis added).  Thus, the court considers itself bound by the
    Ninth Circuit's conclusions regarding the facts that were and were not established by the trial

22  record. *See, e.g.*, *id.* at 748-49 (stating the Ninth Circuit's conclusions regarding the facts
    established at trial relating to the jury's willfulness finding).

ORDER - 7

70:8-16.)  Zillow developed procedures to identify the scope of its license for each

uploaded photo and employed automated protocols to manage the use of each photo

consistent with its evergreen or deciduous designation.  *VHT*, 918 F.3d at 749.

9.      In 2020, Zillow reported $7.49 billion in assets and $3.34 billion in

revenues.  *See* Zillow's 2020 Form 10-K, available at

https://sec.report/Document/0001617640-21-000012/.[4]

**B.      Zillow's Digs Website**

10.      In 2012, Zillow began to develop Digs, a home design platform intended to

keep users engaged with its website even when they were not currently shopping for

homes and to generate revenue from advertisers.  The Digs website provided features to

help home shoppers and homeowners figure out home improvement projects, how much

the projects might cost, and what type of return on investment they could get if they sell

the home after completing the project.  (Acker Tr. (Dkt. # 291) at 187:17-190:0,

218:5-13; Schielke Tr. (Dkt. # 294) at 66:12-18; Trial Ex. 76.)

11.      Zillow built Digs knowing that it required photographs of home interiors

and that Zillow would have access to such photographs through its existing feeds.  (Acker

Tr. (Dkt. # 291) at 190:13-17.)

12.      Zillow launched Digs in February 2013 with 20,000 images taken from

Zillow's listing site.  (Acker Tr. (Dkt. # 291) at 195:6-10, 198:16-199:9.)  To determine

---

[4] The court takes judicial notice of Zillow's annual report pursuant to Federal Rule of Evidence 201 and concludes that it falls under the hearsay exclusion for admissions in Federal Rule of Evidence 801(d)(2).

1  which images to display on Digs, Zillow's moderators looked at images from the listing

2  site for which Zillow had evergreen rights, identified those that looked to be interesting

3  or notable for Digs users, and tagged them to reflect certain attributes of the photos.

4  (Schielke Tr. at 70:5-9, 78:19-79:1, 79:10-19, 80:9-81:3.)  These tagged images were

5  included in a searchable set of images for Digs users.  (Schielke Tr. at 70:24-71:10.)

6       13.     When it launched, Digs contained 870 VHT images – that is, images that

7  Zillow had obtained from feed providers that had, in turn, licensed the images from VHT

8  for use in marketing specific properties or real estate agents.  (Trial Ex. 512,[5] Col. AD =

9  "Y"; Balduf Tr. at 77:19-80:23, 86:18-87:25.)  Of these, eight are among the 2,700

10  directly infringed, searchable, displayed images at issue in this trial.  (Trial Ex. 512, Col.

11  N = "Board + Searchable (Removed)," "Searchable," and "Searchable + Board"; Col. AD

12  = "Y"; Col. AR = "Y"; Col. AW = "Y".)

13       14.     After launch, Zillow added the ability for its users to save evergreen images

14  from its home details web site pages, which displayed images associated with real estate

15  listings or off-market properties.  (Schielke Tr. at 71:17-25, 74:16-19.)  Images that

16  Zillow users saved using this feature were added to a queue for review by Zillow's

17  moderators, who eventually reviewed the images, added a subset of them to the

18

19

20

21

22

---

[5] The parties stipulated that the Excel spreadsheet introduced as Trial Exhibit 512 "lists each image at issue in this case and summarizes relevant data about each image, including certain facts relating to VHT's creation and distribution of the image, as well as certain facts relating to Zillow's use of the image on Digs."  (Trial Ex. 600 ¶ 12.)  They further agreed that the factfinder "must treat every fact in this spreadsheet as proven."  (*Id.*)  Citations to Trial Exhibit 512 include the set of column filters that the reader should apply in order to view the relevant data.

searchable set of images, and added tags that would enable the images to appear in Digs search results.  (*Id.* at 79:10-81:7.)

15.     VHT did not license its images to Zillow directly for use on Digs.  Zillow never paid VHT, nor asked VHT's permission, to use VHT's images on Digs.  (Balduf Tr. at 99:2-16, 127:21-23; *see also id.* at 98:16-99:1 (noting that under VHT's license, its customers can display VHT's images on Zillow as long as the images are being used for the purpose of marketing homes).)

16.     Zillow projected that Digs would generate over $48 million in annual revenue for Zillow by 2018.  (Acker Tr. (Dkt. # 291) at 219:6-220:21; Trial Ex. 76.)  By 2017, however, Digs was generating only about $28,000 to $30,000 per month in revenue, or less than $360,000 per year.  (Acker Tr. (Dkt. # 292) at 74:20-25.)

17.     A total of 2,700 of VHT's images that Zillow used on the Digs website were at issue in this trial.  (*See* 6/20/17 Order (Dkt. # 315) at 46); *VHT*, 918 F.3d at 748. The jury's finding that Zillow directly infringed these images was affirmed on appeal. (Verdict Form at 1-2); *VHT*, 918 F.3d at 750.

**C.     Negotiations after the Digs Launch**

18.     Shortly after the February 2013 launch of Digs, VHT's Vice President of Sales, Kevin McGuire, learned about Digs through a press release and visited the Digs website.  (McGuire Tr. (Dkt. # 291) at 25:11-16.)  He noticed that there were photographs from one of VHT's customers and assumed that the photos belonged to VHT.  (*Id.* at 25:17-23.)  He was "intrigued" and thought Digs would provide an opportunity for VHT to license its images to Zillow.  (*Id.* at 25:24-26:11.)

1      19.     On February 11, 2013, Mr. McGuire sent an email to Greg Schwartz,

2   Zillow's Chief Business Officer, titled "Content for Digs."  (*Id.* at 26:12-15; Trial Ex.

3   51.)  In this email, Mr. McGuire asked Mr. Schwartz who he should speak with "about

4   helping [Zillow] gain Hi Resolution content for your D[igs] section[.]"  (Trial Ex. 51.)

5   He pointed out that Digs already contained some of VHT's images but did not say

6   anything about VHT infringing on those images.  (*Id.*)

7      20.     On or about February 14, 2013, Mr. McGuire, Mr. Schwartz, and VHT's

8   former Chief Operating Officer participated in a call.  (McGuire Tr. at 27:19-24.)  During

9   this call, Mr. McGuire told Mr. Schwartz that VHT owned the copyright on millions of

10  photographs that it could license to Zillow for use on Digs and that VHT could provide a

11  data feed of photos directly to Zillow.  (*Id.* at 27:25-28:17.)  Although Mr. McGuire told

12  Mr. Schwartz that VHT owned the copyright in its photos and was interested in licensing

13  them, he did not tell Mr. Schwartz that Zillow was infringing on those photographs, nor

14  did he ask Zillow to remove the images from Digs.  (*See id.* at 29:5-11, 55:14-56:3; *see*

15  Schwartz Tr. at 63:1-6 (stating the "principal point" of the call was VHT's interest in

16  selling Zillow its database of photos).)

17     21.     After that call, Mr. Schwartz emailed other Zillow executives that he was

18  "warm to the idea" of VHT "contribut[ing]" "high quality photos with rights" to Digs.

19  (Trial Ex. 45.)

20     22.     Mr. McGuire and Mr. Schwartz continued to discuss content for Digs over

21  the next several months.  (*See* Trial Ex. 506.)  Mr. Schwartz eventually brought Chris

22

1   Crocker, another Zillow executive, into the discussion.  (McGuire Tr. at 29:12-35:3; Trial

2   Ex. 506.)

3          23.     VHT and Zillow continued to discuss a potential license through July 2013.

4   (*See* Trial Ex. 506.)  The parties even discussed what it would take to build a data feed

5   from VHT for active listings.  (*See* McGuire Tr. at 33:14-20; *see also* Balduf Tr. at

6   104:22-105:4 (stating that VHT had started to look at how they would "operationalize" a

7   feed).)  During a call on July 24, 2013, however, Mr. Crocker informed Mr. McGuire and

8   VHT's Chief Executive Officer Brian Balduf that Zillow had decided to "go in another

9   direction" for photographs for Digs and would no longer need to discuss a license.  (*Id.* at

10  33:21-34:14; Balduf Tr. at 105:5-11.)

11         24.     At no point during these discussions did VHT accuse Zillow of

12  infringement or ask Zillow to remove its photos from Digs.  (Balduf Tr. at 137:17-20

13  (acknowledging that VHT did not accuse Zillow of infringing its copyrights for over a

14  year after it first contacted Zillow because its executives were interested in "doing a deal"

15  with VHT).)

16         25.     The court finds, based on the evidence in the trial record, that the

17  discussions between Zillow and VHT between February and July 2013 focused on

18  licensing a separate feed of high-resolution photos directly from VHT to Zillow for use

19  on Digs.  The parties did not discuss Zillow's need to obtain a license to use photographs

20  that it received from its feed providers on Digs, nor did VHT accuse Zillow of infringing

21  its rights in any of the images that Zillow was already using on Digs.

22

1    **D.     VHT's Notice Letter and Subsequent Events**

2         26.     On July 10, 2014, VHT formally notified Zillow in a cease and desist letter

3    that Zillow's use of its images on Digs was unauthorized and outside the scope of any

4    license VHT had granted its customers.  (Trial Ex. 98 ("Notice Letter").)  The letter put

5    Zillow on notice that VHT "owns and retains all copyrights" in works created by VHT or

6    its photographers.  (*Id.*)  It stated that VHT's license to its clients, including Zillow's feed

7    providers, was limited to allowing licensees to market properties depicted in the

8    photographs.  (*Id.*)  The letter explained that VHT could not provide a website URL for

9    each infringing image because the image URLs were not static.  (*Id.*)  VHT did, however,

10   provide a list of allegedly infringed images identified by property address.  (*Id.*)  It asked

11   Zillow to remove the images and to take steps to ensure that VHT's images would not be

12   used in the future for any purpose unrelated to the marketing of properties currently for

13   sale.  (*Id.*)

14        27.     By the time VHT sent the Notice Letter, Zillow had already displayed on

15   Digs 388 of the 2,700 images at issue in this trial.  (Trial Ex. 512, Col. N = "Board +

16   Searchable (Removed)", "Searchable", and "Searchable + Board"; Col. AR = "Y";

17   Col. AW = "Y"; Col. AU = "N".)

18        28.     "At no point during their year of communications prior to [VHT's] issuance

19   of the Notice Letter did VHT raise the specter of infringement."  *VHT*, 918 F.3d at 749;

20   (*see also* Balduf Tr. at 137:17-20).

21        29.     After VHT sent the Notice Letter, Zillow reached out to VHT to schedule a

22   call which included Mr. Balduf and Mr. Schwartz.  (*See* Trial Ex. 101; Schwartz Tr. at

73:3-6.)  On July 18, Zillow proposed sending photography business to VHT in exchange

for releasing its claims.  VHT rejected the proposal.  (Schwartz Tr. at 71:2-72:8.)  Mr.

Schwartz explained his understanding that Zillow's feed providers had given it the right

to use the photos in the manner Zillow was using them.  (*Id.* at 72:17-73:2.)

30.    Zillow responded to the Notice Letter on July 21, 2014.  (Trial Ex. 103.)  It

requested "a sample" of each form of VHT's license agreement in order to evaluate the

terms of VHT's licenses.  (*Id.*)  It also stated that it had sampled the properties listed by

VHT in its Notice Letter and found that "as many as thirty percent" of the images were

"properly posted."  (*Id.*)  It did not request additional identifying information for the

images that VHT asserted were infringed.  (*Id.*)  Zillow stated that it would work

cooperatively with VHT to resolve the issues and would promptly review the requested

licensing information.  (*Id.*)

31.    In a letter dated July 28, 2014, VHT provided to Zillow its standard license

terms, which included a provision limiting the use of VHT's images to "the sales or

marketing of the subject property or the company/agent representing the property."

(Trial Ex. 105.)  It did not provide a copy of any form of agreement.  (*See id.*)

32.    The parties subsequently engaged again in discussions about a possible

licensing agreement.  (*See* Trial Ex. A-102; Balduf Tr. at 121:12-19.)  These discussions

included calls and emails.  (*See* Trial Ex. 113; Schwartz Tr. at 74:23-75:2.)

33.    On September 16, 2014, Mr. Schwartz emailed Zillow's chief legal officer,

Kathleen Philips, copying Mr. Balduf, and asked Ms. Philips to "top line" the information

Zillow would need to "build a 'valuation model.'"  (*See* Trial Ex. A-102 at 2.)

1    34.    Mr. Balduf emailed Ms. Philips on October 8, 2014, to "check in."  (Trial

2  Ex. 137 at 2.)  On October 20, 2014, Ms. Philips responded and requested "[a]ll license

3  agreements in place" between VHT and any broker or agent who provided or would

4  provide photos to Zillow; "[a]ll license/assignment agreements" between VHT and its

5  photographers; and "[a]ny agreements . . . between photographers/brokers and

6  agents/sellers evidencing their understanding of rights in the photos."  (*Id.* at 1-2.)

7    35.    On January 15, 2015, Mr. Balduf emailed Ms. Philips copies of

8  representative VHT agreements with real estate brokers and its standard independent

9  contractor agreement with VHT network photographers.  (*See generally id.*)  Zillow

10  Corporate Counsel Michelle Wynne responded to Mr. Balduf that same day.  (Trial Ex.

11  136.)  In this email, she informed Mr. Balduf that Zillow would review the representative

12  agreements and asked again for VHT to provide the executed versions of the photography

13  and brokerage agreements.  (*Id.*)  Mr. Balduf agreed that he would "absolutely" do so.

14  (*Id.*)  Neither Zillow nor VHT followed up on this exchange, however.  (*See* Trial Ex.

15  136; Balduf Tr. at 157:17-24.)

16    36.    VHT filed this lawsuit on July 8, 2015.  (*See* Compl. (Dkt. # 1).)

17    37.    Zillow added 2,312 of the 2,700 images at issue to Digs after VHT sent the

18  Notice Letter.  (Trial Ex. 512, Col. N = "Board + Searchable (Removed)", "Searchable",

19  and "Searchable + Board"; Col. AR = "Y"; Col. AW = "Y"; Col. AU = "Y".)  The last of

20  the images at issue were added to Digs by February 17, 2016.  (Trial Ex. 512,

21  Col. N = "Board + Searchable (Removed)", "Searchable", and "Searchable + Board";

22  Col. AR = "Y"; Col. AW = "Y"; sort Col. P for "Created in Digs.".)

1  **E.      Issues Related to Removing VHT's Images from Digs**

2         38.     To specifically identify a VHT image, Zillow required a unique image

3  identifier called a Zillow ID, which appears in the URL for the image. *VHT*, 918 F.3d at

4  745.  Zillow did not otherwise have the technical ability to screen out or identify

5  infringing VHT photos among the many photos that were saved or uploaded daily to

6  Digs. *Id.* at 746.  Rather, "[o]nce VHT photos were uploaded to the Listing Platform

7  with appropriate certification of rights, ferreting out claimed infringement through use on

8  Digs was beyond hunting for a needle in a haystack." *Id.*; (*see also* 6/20/17 Order at 39

9  (concluding that "the trial record lacked substantial evidence of a practical ability to limit

10  direct infringement")).

11         39.     The court finds, however, that there is no evidence in the trial record that

12  Zillow asked VHT to identify the allegedly infringing by URL or by Zillow ID until after

13  this litigation was filed.

14         40.     Zillow began to remove the images at issue from Digs starting in July 2016

15  and finished by fall of that year.  (*See* Kutner Decl. (Dkt. # 303) ¶ 2; *see also* 11/4/21

16  Min. Order (Dkt. # 373) (admitting Mr. Kutner's declaration for the limited purpose of

17  showing that Zillow removed VHT's images from its Digs site between July 2016 and

18  September 2016).)

19  **F.      Additional Facts Established in the Record**

20         41.     Each of VHT's images had independent value.  (Verdict Form at 5.)  The

21  jury awarded VHT $2.84 in actual damages per directly infringed image and $200 per

22  innocently infringed image that was eligible for statutory damages.  (*Id.* at 4.)

42.     Each of VHT's images is a separate work for purposes of calculating statutory damages.  (5/8/20 Order at 34-35; 3/10/21 Order at 8.)

43.     Substantial evidence in the parties' first trial "d[id] not show Zillow was 'actually aware' of its infringing activity;" rather, it showed that Zillow's "belief that feed providers had properly licensed its uses and that its system effectively respected those rights was reasonable." *VHT*, 918 F.3d at 749.

44.     Zillow reasonably believed that its feed providers had properly licensed its use of VHT's images and that its system effectively respected those rights. *VHT*, 918 F.3d at 749.  The record suggests no reason to conclude that Zillow maintained that position in bad faith. *Id.*; (*see also* 6/20/17 Order at 52).

## IV.    CONCLUSIONS OF LAW

1.     The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b)(1)-(2) and 28 U.S.C. § 1400.

## A.     Zillow's Infringement

2.     The Ninth Circuit held that Zillow's infringement of VHT's images was not willful as a matter of law. *VHT*, 918 F.3d at 749.  Thus, the issue before the court is whether or not Zillow's infringement was innocent.  The court concludes that Zillow's infringement of VHT's images before VHT sent the Notice Letter was innocent, but its subsequent infringement was not innocent.

1    3.    To prove that its infringement was innocent, Zillow must "sustain the

2    burden of proving . . . that [it] was not aware and had no reason to believe that [its] acts

3    constituted an infringement of copyright."  17 U.S.C. § 504(c)(2).

4    4.    Because the Ninth Circuit found that there was no substantial evidence that

5    Zillow was "actually aware" of its infringing activity before VHT gave it notice, *VHT*,

6    918 F.3d at 749, the issue here is whether Zillow has met its burden to prove that it had

7    no reason to believe that its use of VHT's images constituted an infringement of

8    copyright.

9    5.    Before VHT sent the Notice Letter, VHT did not "raise the specter of

10    infringement" at any time.  *VHT*, 918 F.3d at 749; (*see also* Balduf Tr. at 137:17-20).

11    Although VHT attempted to negotiate with Zillow a separate feed of images for Digs, it

12    did not inform Zillow that it believed its use of VHT's images constituted infringement.

13    *Id.*; (*see also* Balduf Tr. at 137:17-20).  Zillow reasonably and in good faith believed that

14    its feed providers correctly represented that they had properly licensed Zillow's use of

15    VHT's images for Digs and that its system effectively respected those rights.  *VHT*, 918

16    F.3d at 749; (*see also* Trial Ex. A-77 (Zillow's feed provider agreement)).  Zillow did not

17    have access to VHT's license agreements with its customers and thus had no way to

18    confirm that the feed providers incorrectly represented their rights to VHT's images.  *See*

19    *VHT*, 918 F.3d at 749.

20    6.    Therefore, the court concludes that before July 10, 2014, Zillow was

21    unaware and had no reason to believe that its use of VHT's images on Digs constituted

22    infringement.  As a result, its infringement of 388 of VHT's searchable, displayed images

1    on Digs was innocent.[6]  (Trial Ex. 512, Col. N = "Board + Searchable (Removed)",

2    "Searchable", and "Searchable + Board"; Col. AR = "Y"; Col. AW = "Y";

3    Col. AU = "N".)

4           7.     Once Zillow received VHT's Notice Letter, however, it was on notice that

5    VHT believed that Zillow's use of VHT's images infringed on VHT's copyrights.  (*See*

6    Trial Ex. 98.)  The court concludes, as a result, that as of July 10, 2014, Zillow had

7    reason to believe that its use of those images constituted an infringement of copyright.

8    The fact that Zillow subsequently engaged in discussions with VHT in an effort to

9    resolve VHT's infringement claims supports the conclusion that by July 10, 2014, Zillow

10   had reason to believe that its use of VHT's images on Digs constituted an infringement of

11   copyright.  (*See supra* at Findings ¶ 29.)

12          8.     Thus, Zillow's infringement of 2,312 images added to Digs after VHT sent

13   the Notice Letter was not innocent.[7]  (Trial Ex. 512, Col. N = "Board + Searchable

14

15          [6] VHT's reliance on *Childress v. Taylor*, 798 F. Supp. 981 (S.D.N.Y. 1995), for the
     proposition that Zillow's indemnification provision in its feed agreements forecloses a finding of

16   innocence is misplaced.  (*See* VHT F&C at Conclusion ¶ 12 (quoting *Childress*, 798 F. Supp. at
     995-96).)  In *Childress*, the infringer not only included an indemnification provision in his

17   contract, but also had seen the production of the original work (a play) and knew of the
     similarities between the original work and the infringing work "in respect of subject matter,

18   content, and settings." *Childress*, 798 F. Supp. at 996.  These additional factors are not present
     in this case.

19          [7] Zillow argues, citing 4 NIMMER ON COPYRIGHT 14.04 (2021), that all of its infringement
     was innocent because "its infringing conduct was made in a good faith belief of the innocence of

20   its conduct, and . . . it was reasonable in holding that good faith belief."  (*See* Zillow F&C ¶ 114;
     *see also id.* ¶¶ 115-16 (citing out-of-circuit cases that also rely on NIMMER's "good faith belief"

21   formulation of the innocence standard).)  The court declines to adopt NIMMER's "good faith
     belief" standard because it is both circular and contrary to the plain language of the statute.  The

22   court cannot agree that having a "reasonable good faith belief" that conduct is innocent is
     equivalent to having "no reason to believe" that conduct is infringement in the first instance.

1  (Removed)", "Searchable", and "Searchable + Board"; Col. AR = "Y"; Col. AW = "Y";

2  Col. AU = "Y".)

3  **B.     Statutory Damages**

4       9.     "[A]n infringer of copyright is liable for either . . . (1) "the copyright

5  owner's actual damages and any additional profits of the infringer . . . ; or (2) statutory

6  damages, as provided by [17 U.S.C. § 504(c)]."  17 U.S.C. § 504(a).  Here, VHT seeks

7  statutory damages for Zillow's infringement.  (*See generally* VHT Br.)

8       10.    The amount of statutory damages depends on whether the infringement was

9  willful, innocent, or neither willful nor innocent.  *See* 17 U.S.C. § 504(c).  If the

10  infringement was neither willful nor innocent, the court may award damages of between

11  $750 and $30,000 per work, "as the court considers just."  *Id.* § 504(c)(1).  If the

12  infringement was willful, the court "in its discretion" may increase the award to not more

13  than $150,000 per work.  *Id.* § 504(c)(2).  If the infringement was innocent, the court "in

14  its discretion" may reduce the award of statutory damages to not less than $200 per work.

15  *Id.*  The court must determine "what is just in the particular case" within the statutory

16  range; "within these limitations the court's discretion and sense of justice are

17  controlling."  *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 232 (1952).

18       11.    VHT requests an award of $3,000 per image.  (VHT Br. at 8.)

19

20

21  *Compare* 4 NIMMER ON COPYRIGHT 14.04[B][2][a]; *with* 17 U.S.C. § 504(c)(2); *see also L.A.
   News Serv. v. Tullo*, 973 F.2d 791, 800 (9th Cir. 1992) (rejecting defendant's argument that its

22  good faith belief in the legality of its conduct entitled it to a minimum statutory damage award).

12.     "'Statutory damages are available in order to effectuate two purposes underlying the remedial provisions of the Copyright Act:  to provide adequate compensation to the copyright holder and to deter infringement.'"  *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1271 (9th Cir.), *cert. denied*, 142 S. Ct. 343 (2021) (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1554 (9th Cir. 1989)). They are "intended as a substitute for profits or actual damage," and should not provide copyright owners a windfall.  *Id.* (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 520 (9th Cir. 1985)).

13.     The parties agree that the factors this court applied in *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200 (W.D. Wash. 2014), govern the court's determination of statutory damages.  (*See* VHT Br. at 9; Zillow Br. at 14-15.)  These factors are (1) the infringer's profits and the expenses they saved because of the infringement; (2) the plaintiff's lost revenues; (3) the strong public interest in ensuring the integrity of copyright laws; and (4) whether the infringer acted willfully.  *Curtis*, 33 F. Supp. 3d at 1217 (citing *Getty Images (US), Inc. v. Virtual Clinics*, No. C13-0626JLR, 2014 WL 358412, at *7 (W.D. Wash. Jan. 31, 2014)).

14.     Courts typically consider the first two factors—the infringer's profits and expenses saved, and the plaintiff's lost revenues—together.  *See Curtis*, 33 F. Supp. 3d at 1217.  "These factors . . . are generally given less weight than the others because of the inherent uncertainty in calculating an infringer's profits and a plaintiff's lost revenue."  *Id.* (citing *Milene Music, Inc. v. Gotauco*, 551 F. Supp. 1288, 1296 (D. R.I. 1982)).  "Indeed, 'most courts . . . do not attach great weight to profits gained or to income lost,

1    because these amounts are difficult to monetize, and may be marginal at best.'" *Id.*

2    (quoting *Milene Music*, 551 F. Supp. at 1296).  There is "'no required nexus between

3    actual and statutory damages under 17 U.S.C. § 504(c).'" *Id.* at 1219 (quoting *New*

4    *Form, Inc. v. Tekila Films, Inc.*, 357 F. App'x 10, 12 (9th Cir. 2009)).

5        15.    The record before the court does not establish the profits Zillow earned, the

6    expenses Zillow saved, or the revenues VHT lost due to Zillow's infringement.  Based on

7    the evidence presented at the parties' first trial, however, the jury found that VHT was

8    entitled to actual damages of $2.84 per infringed image.  (Verdict Form at 4.)  Although

9    there is no required nexus between actual and statutory damages, *see Curtis*, 33 F. Supp.

10   3d at 1219, the court concludes that the first two factors support statutory damages

11   awards at or near the statutory minimums.

12       16.    The third factor is the strong public interest in ensuring the integrity of

13   copyright laws.  *Curtis*, 33 F. Supp. 3d at 1217.  "If the infringing conduct is severe, a

14   court is more likely to award higher statutory damages because the higher award will

15   deter such conduct in the future."  *Id.* at 1218 (citing *Warner Bros. Enter. v. Caridi*, 346

16   F. Supp. 2d 1068, 1074 (C.D. Cal. 2004)).

17       17.    The court concludes that Zillow's conduct with respect to the 388 images it

18   innocently infringed was not "severe."  Indeed, the court has already concluded that

19   Zillow was unaware of this infringement and had no reason to believe that its conduct

20   was infringement.  (*See supra* at Conclusions ¶¶ 5-6.)  Accordingly, the court concludes

21   that a statutory damages award above the minimum is not necessary to deter similar

22   conduct in the future.

1          18.     With respect to the remaining 2,312 images, Zillow promptly responded to

2     VHT's Notice Letter and requested additional information in an effort to verify VHT's

3     infringement claim.  (*See supra* at Findings ¶¶ 29-25); *see also VHT*, 918 F.3d at 749.  It

4     could not immediately remove the images from Digs because it could not reliably

5     identify them based on the property addresses VHT provided.  (*See supra* at Findings

6     ¶¶ 38-39.)  The court concludes, however, that the third factor supports an award slightly

7     above the statutory minimum to deter companies from using works in a new product

8     without first confirming that they have the correct licenses for such use.

9          19.     "The fourth factor involves considering the willfulness of Defendants'

10    conduct."  *Curtis*, 33 F. Supp. 3d at 1219.  This factor "is typically given the most weight

11    by courts in determining an appropriate amount of statutory damages."  *Id.* (citing *Milene*

12    *Music*, 551 F. Supp. 3d at 1296).  "'The per-infringement award tends understandably to

13    escalate, in direct proportion to the blameworthiness of the infringing conduct.'"  *Id.*

14    (quoting *Milene Music*, 551 F. Supp. 3d at 1296).

15         20.     Here, it is the law of the case that Zillow's conduct was not willful.  *See*

16    *VHT*, 918 F.3d at 750.  The court concludes that this factor weighs in favor of statutory

17    damages awards at or near the statutory minimums because (1) a finding that Zillow

18    innocently infringed the 388 pre-Notice Letter images is inconsistent with a finding of

19    blameworthiness; and (2) Zillow's conduct after receiving the Notice Letter was

20    reasonable and was not in bad faith.  *See VHT*, 918 F.3d at 749.

21         21.     After considering all of the *Curtis* factors, the court concludes that (1)

22    statutory damages of $200 per work are appropriate for the 388 images for which

1    Zillow's infringement was innocent, and (2) statutory damages of $800 per work are

2    appropriate for the 2,312 images for which Zillow's infringement was not innocent.

3    Accordingly, the court awards VHT $1,927,200 in statutory damages pursuant to 17

4    U.S.C. § 504(c).

5    **C.    Other Matters**

6         22.    Aspects of the July 10, 2017 judgment that were affirmed or not disturbed

7    on appeal will be incorporated into the court's amended final judgment, including the

8    court's entry of judgment for (i) actual damages in the amount of $3,467.64, for Zillow's

9    direct infringement of 1,221 searchable, displayed images that were not eligible for

10   statutory damages; (ii) pre-judgment interest on that award; (iii) statutory damages in the

11   amount of $400 for two directly infringed images the jury found were innocently

12   infringed; and (iv) post-judgment interest on both awards.  (*See* 7/10/17 J.)

13        23.    VHT requests post-judgment interest from July 10, 2017, the date the court

14   entered the 2017 judgment.  (VHT Br.; *see* 7/10/17 J.)  Zillow has not opposed this

15   request.  (*See* Zillow Resp.; Zillow F&C; Zillow Prop. J.)

16        24.    Where the basis for an award "had already been meaningfully ascertained"

17   before appeal, post-judgment interest on remand should be awarded from the date of the

18   original judgment.  *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life*

19   *Activities*, 518 F.3d 1013, 1021 (9th Cir. 2008).  Here, the 2017 judgment established

20   Zillow's liability for directly infringing the 2,700 images at issue and awarded VHT

21   interest under 28 U.S.C. § 1961, from the date of the judgment.  (7/10/17 J. at 3.)

22   Zillow's liability for these infringements was not disturbed on appeal:  the Ninth Circuit

did not reverse on the merits, nor did it find Zillow's liability was unsupported.  To the contrary, it recognized Zillow did not challenge this liability.  *VHT*, 918 F.3d at 734-35, 744.

25.     Accordingly, the court concludes VHT is entitled to post-judgment interest on the full amount of the damages award, running from the date of the 2017 judgment through the date of payment, at the statutory rate determined pursuant to 28 U.S.C. § 1961.

## V.     CONCLUSION

For the foregoing reasons, the court CONCLUDES that Zillow's infringement of 388 of VHT's images before July 10, 2014 was innocent, and that its infringement of 2,312 of VHT's images after July 10, 2014 was not innocent.  The court AWARDS VHT $200 in statutory damages for each innocently infringed image and $800 in statutory damages for the remaining images, for a total statutory damages award of $1,927,200. The court AWARDS VHT post-judgment interest on the full amount of the damages award, running from the date of the 2017 judgment through the date of payment.  The court will enter an amended final judgment for these amounts plus the $3,867.64 in damages awarded in the 2017 trial that were not disturbed on appeal.

Dated this 26th day of January, 2022.

JAMES L. ROBART
United States District Judge